**MONSANTO COMPANY Plaintiff**

v.

**Mitchell SCRUGGS, Eddie Scruggs, and Scruggs Family Farm Supply Defendants**

No. CIV.A.3:00–CV–161–P–A.

United States District Court, N.D. Mississippi, Western Division.

March 16, 2001.

Order Amending Preliminary Injunction Sept. 4, 2001.

Michael Noel Watts, Robert Bradley Best, Holcomb Dunbar, Oxford, MS, Frank S. Thackston, Jr., Lake Tindall, LLP, Greenville, MS, Joseph C. Orlet, Matthew T. Schelp, Erik L. Hansell, Matthew R. Grant, Glennon P. Fogarty, Dutro E. Campbell, Michele L. Taylor, S. Christian Mullgardt, II, Adam E. Miller, Husch & Eppenberger, LLC, St. Louis, MO, Stephan G. Strauss, Dale R. Joerling, Thompson Coburn, St. Louis, MO, Kenneth A. Letzler, Jonathan I. Gleklen, Michael D. Yeh, Arnold & Porter, Washington, DC, for Plaintiff.

Jim D. Waide, III, Waide & Associates, PA, Tupelo, MS, James L. Robertson, Wise, Carter, Child & Caraway, Jackson, MS, Lisa Scruggs Rohman, Lisa Scruggs Rohman, Attorney, Tupelo, MS, Gary Myers, University, MS, for Defendants.

Paul Eldridge Barnes, Wise, Carter, Child & Caraway, Jackson, MS, William P. Dulaney, Dulaney Law Firm, LLP, Tunica, MS, Steven Cavitt Cookston, Upshaw, Williams, Biggers, Beckham & Riddick, Greenwood, MS, for Movants.

## MEMORANDUM OPINION

PEPPER, District Judge.

This cause is before the Court on the plaintiff's Motion for a Preliminary Injunction. The Court, having reviewed the motion, the response, the briefs of the parties, the authorities cited, and being otherwise fully advised in the premises, finds as follows, to-wit:

## FACTS

This case involves a dispute between the parties over the defendants' unlicensed use of plaintiff's patented technology as incorporated into various agricultural products, specifically Roundup Ready® soybean and cotton seed, and Bollgard® cotton seed. Plaintiff asserts that the defendants' unauthorized use of its patented products amounts to infringement of its rights under the patent and that it is entitled to the entry of an injunction prohibiting the defendants' continued infringement pending a final decision on the merits. The defendants strenuously object, asserting that the plaintiff's decision to obtain utility patents in lieu of certificates under the Plant Variety Protection Act is an impermissible attempt to cut off farmers' practice of saving seed for future planting, a practice long rooted in history and tradition. Defendants assert that the plaintiff's efforts amount at best, to patent misuse, and at worst, to acts prohibited by the federal antitrust laws.

## I. Standard for Granting an Injunction

█ The plaintiff seeks entry of a preliminary injunction pursuant to the provisions of 35 U.S.C. § 283, which reads as follows: "The several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." *Id.* In order to prevail on a motion for preliminary injunction, the moving party must make a clear showing as to four elements:

1. A reasonable likelihood of success on the merits;

2. Irreparable harm if the injunction were not to be granted;

3. The balance of relative hardships weighs in favor of the moving party; and

4. The effect of an injunction on the public interest.

*Bell & Howell Document Management Products Company v. Altek Systems*, 132 F.3d 701, 705 (Fed.Cir.1997). The Court will consider each of these elements in turn and include an analysis of each factor as it relates to the facts as found by the Court.[1]

## A. Likelihood of Prevailing on the Merits

█ In a patent infringement case such as this, the requisite showing is satisfied by demonstrating that the patents at issue are both 1) valid; and 2) infringed. *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988). Issued United States Patents are accompanied by a presumption of validity. Therefore, the burden of establishing invalidity of a patent rests on the party asserting such invalidity. *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985). In addition, a patent holder seeking preliminary injunctive relief may rely on a prior adjudication of patent validity involving a different defendant to meet its burden of demonstrating a likelihood of prevailing on the merits. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed.Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987).

The Court conducted a two day hearing on January 11 and 12, 2001, at which time the parties were permitted the opportunity

---

1. "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988). *See also Lubrizol Corp. v. Exxon Corp.*, 696 F.Supp. 302, 319 (N.D.Ohio 1988).

to present witnesses and exhibits in support of their respective positions. Monsanto presented evidence of the following facts in support of its motion:

Monsanto is engaged in the business of developing, manufacturing, licensing and selling agricultural biotechnology, agricultural chemicals and other agricultural products. After the investment of substantial time, expense and expertise, Monsanto developed plant biotechnology that involves the transfer into crop seed of one or more genes that gives the resulting plants various favorable traits such as making such plants resistant to glyphosate-based herbicides and/or various insects and pests. The patented genetically improved cotton and soybean seed are marketed by Monsanto under the Roundup Ready® and Bollgard® brands. The biotechnology at issue is protected by United States Patent Numbers 5,352,605 and 5,633,435 and others, all of which were issued prior to the events giving rise to this action.

The '435 patent, entitled Glyphosate–Tolerant 5–Enolpyruvylshikimate–3–Phosphate Synthases, discloses and claims biotechnology involving genes, as well as plants, seed, plant cells, plant tissue, etc. containing those genes, which allow a plant to be resistant to glyphosate based herbicides like Roundup® brand herbicide. Specifically, the claims at issue cover genes-as well as plants, plant cells, plant tissue, seed, etc. containing those genes-which enable a plant to produce a protein called CP4–EPSPS. The '435 patent also contains a claim covering a method of farming whereby a farmer plants glyphosate resistant seed and sprays over the top of the produced plants with glyphosate, killing undesirable plants and leaving the patented, resistant crop. Monsanto markets and sells cotton and soybean seed

embodying this patented biotechnology as Roundup Ready® brand seed.

The advantage of the Roundup Ready® seed biotechnology is straightforward: a grower who plants Roundup Ready® crop seed can apply Roundup® brand herbicides or other glyphosate based herbicides, even after the crop has begun to emerge from the soil (known as "over-the-top"), without damaging the crop, but while eliminating weeds and other plants which would interfere with or impair the growth of the crop. Without this biotechnology, it is not possible to make over-the-top applications of Roundup® herbicide or other glyphosate based herbicides without destroying or at least damaging the crop itself.

The '605 patent, entitled Chimeric Genes for Transforming Plant Cells Using Viral Promoters, discloses and claims new genes and gene parts, created by Monsanto as well as the plants, plant cells, etc. that contain those genes and parts. The biotechnology claimed in the '605 patent is used in both Monsanto's Roundup Ready® cotton and soybean seed and the Bollgard® cotton seed. With respect to the Bollgard® seed, the technology claimed in the '605 patent is part of the transformation event which allows Monsanto's patented Bollgard® cotton to produce a protein known as Cryl–Ac. This protein is not naturally present in cotton but when created by a cotton plant having Monsanto's patented gene, Cryl–Ac allows the plant to be resistant to numerous insects and pests which normally prey on cotton crops.

The Bt–Cryl–Ac protein created in a patented plant containing Monsanto's patented gene allows the plant to be resistant to attacks from various pests and insects. Thus, growers using Monsanto's patented Bollgard® cotton seed are able to significantly reduce herbicide applications to

their crops and still achieve improved yield and seed performance.

Monsanto has structured its business arrangements involving the distribution of patented technology in order to safeguard the integrity of its products and to protect its patent rights. Seed companies who wish to use Monsanto's patented biotechnology in their own seed varieties and growers who wish to plant Monsanto's patented biotechnology must enter into licensing agreements with Monsanto, which restrict the use of the product by the seed companies, and subsequent purchasers and growers. The restrictions in Monsanto's licenses have been advertised in trade journals, have been publicized through public meetings with farmers, and appear on the product label.

These restrictions, in part, state that a purchaser may only use the seed to produce a "single commercial crop." The purchaser may not: a) resell or supply the seeds to any other person or entity for the purpose of planting; b) save any of the seed produced from a crop for the purpose of planting; it; or c) save any of the seed produced from a crop for the purpose of selling it to anyone who would use it to plant a subsequent crop. In sum, the license prohibits the "saving" of seed for replanting as each new generation of seed would contain the Monsanto patented gene and would, therefore, be covered by the patents as well.

Roundup Ready® seed technology was first marketed commercially in time for the 1996 planting season. Although relatively new to the agricultural market, Roundup Ready® seeds have already earned a reputation as an effective product, and are considered to be a significant technological advancement to place in the hands of growers, resulting in greater efficiency. Bollgard® technology first became commercially available during the 1998 growing season. Monsanto's Bollgard® biotechnology likewise represents a leap forward in growing technology, enabling its users to substantially reduce levels of pesticide application and associated costs.

Defendants in this case conduct farming operations in various Mississippi counties, including, but not limited to, Lee and Pontotoc Counties, Mississippi. Plaintiff obtained information which suggested that defendants may have planted saved Roundup Ready® soybeans in the 2000 growing season. Monsanto conducted an investigation of defendants' farming operations in an effort to determine the accuracy of this information. The results of the investigation confirmed Monsanto's suspicions and led to the filing of the present suit.[2]

In conjunction with the filing of the Complaint in this case, Monsanto sought and obtained leave to sample the defendants' cotton and soybean fields prior to the defendants' harvest. Subsequent testing of the samples revealed the following:

a. One hundred percent (100%) of the samples taken from the defendants' soybean acreage tested positive for the Roundup Ready® gene technology.

b. One hundred percent (100%) of the samples taken from the defendants' cotton fields tested positive for the Bollgard® technology.

c. Approximately fifty percent (50%) of the samples taken from the defen-

---

**2.** Very briefly, the investigation revealed that the defendants had planted brown bag soybeans containing Roundup Ready® technology; furthermore, surveillance revealed that many of defendants' fields were sprayed "over-the-top," and subsequently displayed symptomatology consistent with glyphosate application.

dants' cotton fields tested positive for the Roundup Ready® technology (i.e., evidencing "stacked" traits for both Roundup Ready® and Bollgard® technology).

Testimony elicited at the hearing makes it abundantly clear that neither the CP4 EPSPS protein nor the Bt–Cryl Ac protein are naturally present in soybean and cotton. Monsanto's Bollgard® cotton is the only commercially available cotton that contains the Bt–Cryl–Ac endotoxin protein. Monsanto's Roundup Ready® soybean seeds and Roundup Ready® cotton seeds are the only commercially available seeds that contain the Roundup Ready® CP4 EPSPS protein.

In addition to the scientific evidence presented, Mitchell Scruggs admitted during his testimony that much of his soybean and cotton crops were Roundup® "resistant;" he further admitted to the use of Roundup® herbicide on his crops. Although Scruggs attempted to refute the test results with testimony that he planted some conventional soybeans and cotton, he was unable to identify any specific fields wherein he planted conventional seed. In any event, the apparent dispute is of little significance inasmuch as Mr. Scruggs also admitted that the defendants never entered into a commercial license for authorized use of the plaintiffs' patented biotechnology.

Testimony at the hearing also revealed that Roundup Ready® and Bollgard® crop seeds may be used and conditioned for reuse. Mitchell Scruggs testified that much of the seed planted by the defendants in their farming operation contains Monsanto's patented gene technology and that his current source for said seed is from seed saved and conditioned for replanting. Defendants own and operate both a soybean seed cleaner and a cotton seed delinting facility, used to prepare seed for re-planting purposes. In addition, defendants sent a quantity of seeds to Sinkers Corporation in Kennett, Missouri for delinting and conditioning, presumably for replanting by the defendants during the 2001 crop season. Samples of that load were sampled by Monsanto; the samples tested positive for Monsanto's patented biotechnology.

There is evidence that defendants have unlicensed Roundup Ready® seed in large quantities. Despite Mr. Scruggs' protestations to the contrary, the plaintiff presented considerable evidence that the defendants have engaged in the sale of reconditioned seeds containing Monsanto's patented gene technology. Testimony at the hearing established that Mr. Scruggs supplied at least some of Marvin Jones' seed needs for the 2000 growing season. Further testimony by expert witness Fritz Koppatschek revealed that ELISA testing of Mr. Jones' fields showed positive results for the Roundup Ready® CP4 EPSPS protein in one hundred percent (100%) of Jones' crops.

### 1. Validity of Monsanto's Patents

As iterated earlier, issued patents are presumed valid. " '[T]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.' A patent is born valid. It remains valid until a challenger proves it was stillborn or had birth defects, or it is no longer viable as an enforceable right." *Roper Corporation v. Litton Systems, Inc.,* 757 F.2d 1266 (Fed.Cir.1985) (quoting from 35 U.S.C. § 282).

The Scruggs defendants give lip service to a claim that the Monsanto patents are invalid. However, review of their briefs submitted in opposition to the instant motion reveals no clear basis for such an argument; instead, their arguments more nearly qualify as attacks on the infringe-

ment element of Monsanto's claim for relief.[3] In any event, the Court shall so address them; to the extent that the arguments raised by defendants are intended as attacks on the validity of the Monsanto patents, it is evident that the analysis which follows reveals them to be inadequate to refute Monsanto's showing as to this element.

The United States District Court, Eastern District of Missouri, Eastern Division, granted Monsanto's Motion for Summary Judgment in *Monsanto Company v. John Mayfield and Paul Mayfield d/b/a Mayfield Farms,* No. 4:99–CV–538 CAS, on July 13, 2000 in favor of Monsanto for infringement of Monsanto's patents, embodied in Roundup Ready® soybeans. This adjudication is evidence in support of the validity of Monsanto's patents. The Court finds that this recent adjudication is entitled to considerable weight in determining whether Monsanto has met its burden of establishing the validity of its patents. The District Court's adjudication of validity, in addition to the presumption of validity which accompanies issued United States patents, is sufficient to satisfy the plaintiff's burden of demonstrating validity for purposes of a preliminary injunction.

### 2. Infringement of Patent

Title 35, Chapter 28, section 271 of the United States Code provides: "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent." *Id.* It is without dispute that the only circumstances under which Monsanto permits its seed partners, and ultimately commercial growers, to utilize its technology is in accordance with a restriction that the limited use of the technology to the production of a single commercial crop, i.e., Monsanto enforces a prohibition against the retention and replanting/resale of its seed for future crops. In addition to the license agreement, which farmers are required to sign at the time of purchase, Monsanto also advertises the restriction in trade journals and notice of the conditions upon which the seed is sold are printed on the packaging.

Mr. Scruggs unqualifiedly testified that he has never executed a license for use of Monsanto's gene technology; he further admits he was aware of the conditions under which Monsanto licenses its technology to seed companies and farmers. Therefore, it is without dispute that Monsanto has never authorized Mr. Scruggs or any of the other defendants to use, make or sell its patented gene technology. The evidence further establishes that the defendants nonetheless obtained seed containing the plaintiff's Roundup Ready® and Bollgard® technology and utilized it for the 2000 crop season. All of the foregoing amount to a strong prima facie showing of infringement of Monsanto's patents by the defendants.

Defendants advance three principle arguments in an attempt to refute Monsanto's evidence of infringement: exhaustion of the patent, allegations of anti-competitive conduct amounting to patent misuse and/or antitrust violations, and finally, they urge the Court to find that Monsanto's election to obtain utility patents to be an impermissible end run around farmers' traditional "right" to save seed for replanting purposes and in direct contravention of specific legislative protection afforded farmers by way of a crop exemption under the Plant Variety Protection Act.

---

**3.** The only argument raised by defendants which might qualify as an attack on the validity of the Monsanto patents is that relating to the Plant Variety Protection Act.

### Exhaustion of the Patent

■ The first of the defendants' arguments is easily addressed. A patent holder is granted the exclusive right to make, use or vend the discovery or invention-in other words, a limited monopoly. *United States v. Univis Lens Co.,* 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). Typically, it is true, the patent holder's decision to sell the patented article exhausts the monopoly and the patent holder thereafter loses the right to control the use or disposition of the patented article. *Id.* Defendants ignore one important point, however. The exhaustion doctrine only applies where the sale or license of the patented invention is an *unconditional* one.

As the Federal Circuit Court of Appeals so noted in *Mallinckrodt, Inc. v. Medipart, Inc.,*:

> The enforceability of restrictions on the use of patented goods derives from the patent grant, which is in classical terms of property; the right to exclude.
>
> .    .    .    .    .
>
> This right to exclude may be waived in whole or in part. The conditions of such waiver are subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse. As in other areas of commerce, private parties may contract as they choose, provided that no law is violated thereby:
>
> "The rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the [patented] article, will be upheld by the courts."

976 F.2d 700, 703 (Fed.Cir.1992)(quoting from *E. Bement & Sons v. National Harrow Co.,* 186 U.S. 70, 91, 22 S.Ct. 747, 755, 46 L.Ed. 1058 (1902)).

Restricted use licenses are to be judged according to whether the given restriction is "reasonably within the patent grant, or whether the patentee has ventured beyond the patent grant and into behavior having an anticompetitive effect not justifiable under the rule of reason." *Mallinckrodt,* 976 F.2d at 708. A restriction may be said to fall within the patent grant where it relates to subject matter within the scope of the patent claims. *Id.* Where the restriction reasonably falls within the patent grant, the inquiry is at an end and the restriction is a valid one. *Id.*

■ In this case, the single use restriction does fall within the patent grant. Given the fact that the gene technology at issue is passed on to subsequent generations of seed, Monsanto's restriction to the production of a single commercial crop is logically intended to protect its patent monopoly and to thereby permit it to capture revenue in the form of future sales of technology. Without the prohibition against the saving of seed for replanting or resale, Monsanto's patent would soon be rendered useless by virtue of the potential for exponential multiplication of the seed containing its patented technology. Given the risk of Monsanto's thus losing control of its technology, the limited license of its technology was the only reasonable alternative available to it if it hoped to garner a reasonable return on its sizeable investment while making the technology available for commercial use at a reasonable price to consumers.[4]

---

4. Testimony at the hearing indicated Monsanto has input several hundred million dollars into the research necessary to develop the Roundup Ready® and Bollgard® technolo-

■ The defendants go one step further in this charade, arguing that they are not bound by the licensing conditions imposed by Monsanto inasmuch as they never agreed to such a term. Instead, they argue that they obtained Roundup Ready® and Bollgard® seed from authorized Monsanto dealers without executing a license. Accordingly, they urge, they are not subject to the licensing restrictions imposed on other buyers. The Court is not persuaded. The *Mallinckrodt* case specifically notes: "In accordance with the Uniform Commercial Code a license notice may become a term of sale, even if not part of the original transaction, if not objected to within a reasonable time." *Id.* (citing U.C.C. § 2–207(2)(c))(codified under Mississippi statutory law as *Miss.Code Ann.* § 75–2–207(2)(c)). Mitchell Scruggs and the other defendants were aware of the conditions under which Monsanto and its seed partners made its technology available to consumers. Their failure to contest the terms of the conditional license within a reasonable time after sale suggests that Monsanto's licensing conditions became an enforceable term of sale.

### Antitrust/Patent Misuse

■ Virtually the same analysis applies to the defendants' assertions of patent misuse and antitrust violations. While the Court hesitates to rule absolutely that the defendants are not entitled to further litigate these theories, at the present stage of the proceedings, they have presented the Court with neither facts nor law in support of their position.[5] The "monopoly like" control exerted by Monsanto is a lawful monopoly granted by the United States pursuant to the patent laws. Noth-

---

gies. If the limited licensing mechanism were not available to Monsanto, it would, as defendants charge, have to reap its reward on a fewer number of sales. By logical extension, Monsanto would have to adjust its pricing policy to reflect as much, possibly resulting in such a high price that few farmers could afford the cost of the seed and thereby rendering the technology unavailable to all but the most wealthy. With such a limited market for the technology, it is quite conceivable that it would be commercially infeasible for Monsanto to offer the benefits of its patented biotechnology at all. The result would be a loss to the farmers and a deterrent to future research by Monsanto.

5. For example, the defendants' antitrust/patent misuse defense argument is limited in extent to two cursory paragraphs in their initial brief opposing entry of a preliminary injunction. The entirety of the argument is set forth as follows:

> In addition, the patent cannot be used to secure any monopoly beyond that contained in the patent. *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 230, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964)(citing *Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942)). The

patentee's control over the product when it leaves his hands is sharply limited, and cannot be used in disregard of the antitrust laws. *Id.* (citing *United States v. Univis Lens Co.,* 316 U.S. 241, 250–252, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942); *International Business Machines Corp. v. United States,* 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); *United Shoe Machinery Corp. v. United States,* 258 U.S. 451, 463–464, 42 S.Ct. 363, 66 L.Ed. 708 (1922)).

> In the present case, Monsanto has a monopoly or monopoly like control over Roundup Ready® and Bollgard® seed products. There are no alternative sources or comparable seed products in the market. By using its patent to maintain or extend its monopoly, Monsanto has violated both state and federal antitrust laws. Specifically, Monsanto's actions constitute unlawful restraints of trade and attempts to monopolize under Mississippi Antitrust Laws, Mississippi Code Annotated §§ 75–21–1, et seq. (1972) and the Sherman Antitrust Act, 15 U.S.C. §§ 2 and 3.

Defendants' Brief at 5. Even the defendants' post-trial brief, which rambles on at length for some five pages about patent misuse and antitrust issues, fails to enunciate a single coherent thought worthy of treatment herein.

ing in the cases cited by the defendants remotely suggests that Monsanto's effort to restrict the terms upon which it offers its patented biotechnology for sale/use amounts to an effort to exert a monopoly over other products not within the scope of the patents or to expand the temporal scope of the patent beyond the term permitted under the patent laws. Neither do the defendants provide a citation for any authority which suggests that the plaintiff's conduct otherwise amounts to an illegal restraint on trade. In short, the cases cited by the defendants are inapposite.

### Utility Patent vs. Plant Variety Protection Act

■ Lastly, the defendants urge the Court to find the law too unsettled with regard to the plaintiff's rights to obtain and to enforce a utility patent on sexually reproducing plants to warrant the grant of preliminary injunctive relief. The defendants hinge their arguments on the Plant Variety Protection Act, which they contend is the sole method available to plaintiff for obtaining protection for sexually reproducing plants. By extension, defendants urge that the plaintiff's limited licensing scheme violates § 2543 which specifically permits the saving of protected seed varieties by farmers for replanting purposes. Defendants' arguments, while not without persuasive force, are unavailing.

A recent decision of the Federal Circuit speaks to the first of these issues and answers it in the negative. *Pioneer Hi-Bred International, Inc. v. J.E.M. Ag Supply, Inc.,* 200 F.3d 1374 (Fed.Cir.2000), *cert. granted,* 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954, 68 U.S.L.W. 3775 (Feb. 20, 2001). In the *Pioneer* case, the Federal Circuit addressed and rejected each of the arguments raised by the defendants as support for the proposition that the Plant Variety Protection Act is the sole

means for obtaining protection for seeds and seed-grown plants. In particular, the Court of Appeals took note:

The district court observed that the Patent and Trademark Office has been granting patents on new and unobvious varieties of seed-grown plants for at least fifteen years. In *In re Hibberd,* the Board confirmed this PTO position, rejecting the argument that "the plant-specific Acts (PPA [Plant Protection Act] and PVPA [Plant Variety Protection Act]) are the exclusive forms of protection for plant life covered by those acts." . . . .

The district court discerned no historical basis for excluding seed-grown plants from the scope of § 101, referring to the Supreme Court's explanation of why plants were not previously deemed to be patentable: first, plants are 'products of nature,' and second, plants could not be described with sufficient precision to satisfy the written description requirement of the patent statute. *Now, however, mankind is learning how to modify plants in ways unknown to nature.* In addition, precision of description is no longer an insurmountable obstacle, due both to rules authorizing the deposit of new species in publicly available depositories, and advances in botanical understanding and analysis. *The Court, cognizant of advances in science, has ratified the traversal of these past impediments to the compass of § 101. Although there remain the traditional categories that have never been viewed as patentable subject matter, viz., laws of nature, natural phenomena, and abstract ideas, the policy underlying the patent system fosters its application to all areas of technology-based commerce.*

*Id.* at 1376 (citations omitted)(emphasis added).

The Court went on to embrace the lower court's finding that "there is no impediment to reading all of the statutes concerning plant protection in harmony. Thus the district court concluded that a person who develops a new plant variety may have recourse either to patenting under Title 35 or to registration under the PVPA." *Id.* at 1377. Furthermore, the Court of Appeals specifically concluded that the utility patent statute and the PVPA do not have to be construed as antagonistic to one another: "[T]he asserted conflict is simply the difference in the rights and obligations imposed by the two statutes." *Id.* at 1378.

The protections afforded under the patent laws of the United States are broader, and consequently, patent applicants must meet a higher threshold in order to qualify for issuance of a patent than for registration of a new plant variety pursuant to the PVPA.[6] The Solicitor General's amicus brief on the petition for certiorari to the United States Supreme Court puts it quite aptly:

> Although more difficult to obtain, utility patent protection for sexually reproduced plants and seeds under Section 101 is broader in scope than the protection afforded by a plant variety protection certificate under the PVPA. The protection afforded by a certificate is limited to the particular variety described therein. A utility patent, by contrast, may be granted to protect discoveries embracing a class or species or plants, and does not have to be limited to a particular plant variety. The PVPA also establishes several exemptions to infringement that do not apply to utility patents. The exclusive rights granted by a certificate of plant variety protection are subject to a prior use clause, a research exemption, and a crop exemption for farmers, all of which may limit the breeder's ability to recover an economic return.

> For those applicants who can comply with the stringent requirements for patentability under Section 101, utility patent protection offers more extensive protection than the PVPA. Limiting the scope of Section 101 to exclude sexually reproduced plants-thus denying that broader protection-would be contrary to congressional intent ... and would reduce incentives for research and development in the agricultural and horticultural arts.

Brief of Amicus Curiae United States at 10–11, *Pioneer Hi–Bred International, Inc. v. J.E.M. Ag Supply, Inc.*, 200 F.3d 1374 (Fed.Cir.2000), *cert. granted*, 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954, 68 U.S.L.W. 3775 (Feb. 20, 2001).

The Court finds the above arguments persuasive. When considered alongside the currently controlling authority of the *Pioneer–HiBred* case,[7] it is sufficiently clear that the PVPA is no impediment to the enforceability of Monsanto's patents in this case. The same rationale informs the Court's decision with regard to plaintiff's right to employ a limited licensing program with respect to the use and/or sale of its patented Roundup Ready® and Bollgard® gene technology: the § 2543 crop exemption for farmers under the PVPA is

---

**6.** *See* Brief of Amicus Curiae United States at 9–10, *Pioneer Hi–Bred International, Inc. v. J.E.M. Ag Supply, Inc.*, 200 F.3d 1374 (Fed.Cir.2000), *cert. granted*, 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954, 68 U.S.L.W. 3775 (Feb. 20, 2001)(discussing the differing requirements for the grant of patents and the issuance of certificates pursuant to the PVPA).

**7.** The Court is fully aware of the current procedural posture of the *Pioneer Hi–Bred* case. Nonetheless, the Court is constrained to make a ruling on the instant motion based on the law as it now exists.

not an effective restriction of Monsanto's right to limit the circumstances under which it makes its patented technology available to seed companies and growers.

In the first instance, nothing in the record before the Court suggests that Monsanto even possesses PVPA certificates which might be said to cover the technology at issue in this case. Without such a showing, there is no reason to infer that the PVPA's crop exemption has even the most remote relevance to the present case. Furthermore, even if it were shown that Monsanto obtained PVPA certificates for its Roundup Ready® and Bollgard® seeds and plants, the Federal Circuit's decision in the *Pioneer Hi–Bred* case all but dictates the conclusion that the additional protections afforded Monsanto by virtue of the United States patent laws permit it to determine, within the confines of reason, how best to offer its patented discoveries for sale or use by others. "The fact that laws are of different scope does not invalidate the laws." *Pioneer Hi–Bred,* 200 F.3d 1374 (Fed.Cir.2000),

Certainly, history reveals a deeply-rooted tradition of farmers saving seed. But that practice pre-dates the advent of biotechnology. The Court declines to presume that "tradition" alone gives the defendants and other modern farmers the unmitigated right to appropriate the plaintiff's technologies to their own use. It would be antithetical to the purposes of the patent laws to permit consumers, in this case the defendants, to disregard the restrictions imposed by Monsanto and to instead unilaterally determine the circumstances under which a patent holder's discovery is to be offered for use or sale.

B. Threat of Irreparable Harm to the Plaintiff

█ Where the patent holder makes a clear showing of validity and infringement,

it is entitled to a presumption of irreparable harm. *Bell & Howell Document Management Products Co. v. Altek Systems,* 132 F.3d 701, 705 (Fed.Cir.1997); *Bio-Technology General Corp. v. Genentech, Inc.,* 80 F.3d 1553, 1558 (Fed.Cir.1996). Although the plaintiff's showing on the foregoing elements alone is enough to sustain a finding of irreparable harm, much of the testimony elicited at the hearing also supports such a finding.

Monsanto has expended substantial time, effort and money into the development of the Roundup Ready® and Bollgard® technology markets, which defendants' use exploits. Defendants' infringing use of Monsanto's patented technology causes consumer confusion and lost sales by Monsanto. The testimony of Dave Rylander clearly established that Roundup Ready® and Bollgard® seed have already earned a reputation as effective products, and are considered to be significant technological advancements to place in the hands of growers, resulting in, among other things, substantially greater farming efficiency. Maintaining the reputation and integrity of its products is essential to Monsanto's business operation. Defendants' continued infringing use of Monsanto's patented technology ultimately results in a direct loss in revenue, goodwill and a potential reduction of research and development activities, which will undoubtedly irreparably harm Monsanto. *Genentech,* 80 F.3d at 1566.

Furthermore, much of the testimony at the hearing was devoted to an explanation of the special refuge requirements applicable to Bollgard® technology. The witnesses for Monsanto clearly communicated the dangers posed should Monsanto fail to appropriately steward the technology: i.e., the potential for an EPA decision to withdraw the product's registration or to impose more stringent refuge requirements,

along with the equally damaging prospect of the targeted pests developing resistance to the genetically engineered Bt toxin-thereby rendering the product of little or no continued value to Monsanto and the agricultural industry.[8]

Defendants presented no evidence tending to refute the testimony of plaintiff's witnesses. Instead, the defendants targeted their presentation toward showing that Monsanto's injuries were capable of compensation by way of money damages. While the injuries attributable as a result of the defendants' saving of seed for replanting on their own property does lend itself to quantification, the other damages, including that resulting from previous and potential future unlicensed brown bag sales of Monsanto's patented Roundup Ready® and Bollgard® technology, are far less easily determined and computed. Equally difficult to discern are the resulting damages due to loss of consumer good will, the effect on Monsanto's efforts to control and steward its technology, and the corresponding dampening effect on Monsanto's research and development activities in the agricultural arena. In any event, the weight of authority holds that

> because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole. The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which may have market effects never fully compensable in money. "If monetary relief were the sole relief afforded by the patent statute then injunctions

would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts."

*Id.* at 1456–57 (quoting from *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d at 1230, 1233 (Fed.Cir.1985)). In light of the available evidence, the Court finds that Monsanto has satisfied its burden of demonstrating a threat of irreparable harm.

### C. Balance of Hardships Favors the Plaintiff

The Court must balance the hardships between the parties in the event the preliminary injunction should issue. *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1457 (Fed.Cir.1988). The harm that will occur to the moving party from the denial of the preliminary injunction must be balanced against the harm the non-moving party will incur if the injunction is granted. *Id.* "In weighing the harm to the patentee against the potential harm, in the event the injunction issues, to the accused infringer, the Court must look to the nature and cause of that harm, and may take into consideration the infringer's knowledge of the patent and its infringement." *Lubrizol Corp. v. Exxon Corp.*, 696 F.Supp. 302, 323 (N.D.Ohio 1988). It is not absolutely necessary that this factor weigh positively in favor of the movant in order to permit an award of preliminary injunctive relief. *Abbott Laboratories*, 849 F.2d at 1457–1458.

A consideration of the evidence does, however, support a finding that this factor favors the plaintiff. The issuance of a preliminary injunction enjoining defendants from further infringing activities

---

**8.** Dave Rylander's testimony established that the defendants' unlicensed (and therefore, unreported) use of Bollgard® technology would have raised the use of Bollgard® technology in Lee and Pontotoc Counties very near the seventy-five percent (75%) threshold, thereby implicating additional refuge requirements. The instant example demonstrates how the defendants' infringing use of the plaintiff's technology puts both Bollgard®'s registration, and the entire technology, at risk.

would not cause any undue harm to the defendants and would aid Monsanto in the protection of its intellectual property rights. The nature of the technology in this case is unique because Roundup Ready® and Bollgard® crop seed may be used, conditioned and easily resold for planting by a dishonest grower despite the fact that such reuse is not an authorized use of the patented products. Accordingly, should the defendants transfer the crop seed which is presently in their possession and/or control, the exponential yield of new infringing plants and seed created from such use will cause a severe hardship to Monsanto.[9]

Defendants admit that Monsanto placed labeling on its bags of patented seed that indicated the existence of patent rights. Defendants nonetheless used Monsanto's patented technology with full knowledge and disregard of the existence of Monsanto's patent rights. Any harm suffered by defendants as a result of the issuance of a preliminary injunction is, in short, largely self-inflicted.

The plaintiff's witnesses presented substantial testimonial and documentary evidence concerning the availability of conventional seed and its historical record of performance in Mississippi, and in particular, North Mississippi. Without reciting an exhaustive list, Monsanto witness Dave Rylander testified that suitable alternatives for soybeans include varieties produced by Pioneer, Asgrow, Delta King, Hartz, Hornbeck, Terral–Norris and Hutchinson. Effective herbicide alternatives for soybeans include Domain and Axiom, produced by Bayer, Accent from Dupont, as well as new herbicide products from Syngenta. Likewise, conventional cotton varieties include: Rhone Poulenc's BXN 47, Stoneville 474, Aventis' Fiber-

max, Dow Elanco's Phytogen 355, Delta & Pine Land varieties 20, 50 and 90. Rylander also testified as to the availability of effective herbicide and pesticide programs for conventional cotton. His testimony is supplemented by post-hearing submissions providing substantial research data regarding the performance records of various soybean and cotton varieties in the region. In addition, the subsequent documentary submissions confirm that there are numerous herbicide products available for the control of broadleaf weeds, as well as sicklepod and cocklebur-particular weed problems identified by the defendant, Mitchell Scruggs.

The defendants presented considerable testimony concerning the effect of a preliminary injunction on their ability to carry on their farming business and their agricultural supply business. While the Court is cognizant of the significant advantages which accompany the use of plaintiff's Roundup Ready® and Bollgard® seed technology, it finds Mitchell Scruggs' testimony simply incredible as to his inability to obtain and utilize suitable substitute products in the form of conventional soybean and cotton seeds in conjunction with an appropriate herbicide and pesticide program. In the first instance, the testimony and documentary evidence presented by plaintiff belies the defendants' assertions. In the second instance, the Court finds it unfathomable that defendant Scruggs can argue that he will be unable to maintain profitable farming operations without access to Monsanto's patented gene technology. Roundup Ready® and Bollgard® seed products were not commercially available until 1996 and 1998, respectively. The defendants managed to survive, and even flourish, for a substantial period before the products at issue became avail-

---

**9.** As noted *supra,* testimony at the preliminary injunction hearing strongly indicated that the

defendants have engaged in exactly such conduct.

able.[10] Furthermore, the testimony at the hearing established that the costs of other herbicides have fallen significantly since the introduction of Roundup Ready® technology to the agricultural market, thereby contributing to more readily affordable weed control for growers seeking to utilize conventional seed varieties.

The situation is less clear with respect to the effect of an injunction on the defendant's farm supply business. Defendants' witnesses testified that the inability to offer Monsanto's patented gene technology would result in substantial lost sales not limited to those of the products at issue. In essence, Mr. Scruggs and Donald Bunch testified that farmers who are forced to buy one product elsewhere are likely to meet their other supply needs through the same alternate location. However, the testimony is insufficient to warrant a conclusion that the defendants' farm supply business would be forced to close its doors prior to a final adjudication on the merits. Nor was there any suggestion that any damages sustained by defendants as a result of a wrongful injunction are incapable of satisfaction by way of the necessary bond to be posted by the defendants.

Notwithstanding the testimony regarding the deleterious effect an injunction might have, the defendants' farm supply business is not an authorized Monsanto dealer; Monsanto is not obligated to afford defendants the opportunity to sell its products. To force it to do so under the present circumstances would be to reward the defendants for their willful infringement of the plaintiff's patented seed technology.

Furthermore, there is evidence before the Court which indicates that the defendants have been less than diligent in ensuring that the required license agreements are properly executed for each new growing season[11]. These factors, considered in conjunction with the extra expense and effort which Monsanto would have to expend in policing the defendants' continued handling of its patented technology, leads the Court to find that the balance of hardships favors Monsanto.

### D. The Public Interest Weighs in Favor of the Injunction

■ The Court finds that there is no critical public interest that would be injured by the grant of preliminary injunctive relief against the defendants. *Bell & Howell Document Management Products Company v. Altek Systems*, 132 F.3d 701, 708 (Fed.Cir.1997). The public interest is not served by allowing an infringer to profit at the expense of the holder of a lawfully issued patent. Growers who are properly licensed to use Monsanto's patented technology, and who have paid for the advantages of patented crop seed, have an interest in seeing to it that a "black market" for this crop seed is not allowed to exist and to thrive. If defendants are permitted to continue utilizing Monsanto's patented technology in violation of the limitations imposed by the licensing agreement, and without paying for the right, defendants will have secured an unfair advantage over all growers who have acted in good faith in compliance with their licenses. It is not in the public's best interest to

**10.** Mitchell Scruggs testified at the hearing that his net worth is somewhere in the neighborhood of $5,000,000 to $8,000,000.

**11.** After Monsanto terminated its dealership agreement with defendants, the defendants worked out an informal arrangement whereby they obtained access to Monsanto's patented biotechnology through other local authorized Monsanto dealers. Issuance of an injunction will effectively eliminate this outlet for obtaining access to the plaintiff's technology.

have patented technology pirated in that such would discourage future investment in innovative technology. "It is difficult to see, and the evidence in this case has not established, in what way the public interest is better served by permitting an infringer to profit at the expense of the holder of a patent, than by enforcing the exclusive patent rights and enjoining the infringement." *Lubrizol Corp. v. Exxon Corp.*, 696 F.Supp. 302, 318 (N.D.Ohio 1988).

## CONCLUSION

Based on the applicable law and the facts as found by the Court, the Court is of the considered opinion that the plaintiff's Motion for Preliminary Injunction is well-taken and should be granted. An order will issue accordingly.

## *ORDER GRANTING PRELIMINARY INJUNCTION*

This cause is before the Court on the plaintiff's Motion for Preliminary Injunction. The Court, having reviewed the motion, the response, the briefs of the parties, the authorities cited, and being otherwise fully advised in the premises, finds as follows, to-wit:

In accordance with the Memorandum Opinion entered this day, the plaintiff's motion is well-taken and should be granted. Accordingly, until further Order of this Court, defendants Mitchell Scruggs, Eddie Scruggs, and Scruggs Family Farm Supply and all persons acting on their behalf (hereinafter "defendants") are:

1. Prohibited from all current and future purchase, acquisition, use, sale, offers to sell, transfer (except as hereafter provided in paragraph 4), brokering, cleaning, delinting and/or reconditioning of Roundup Ready® soybean seed, Roundup Ready® cotton seed and Bollgard® cotton seed, including any type of "Roundup-resistant" soybean or cotton seed (hereinafter collectively "Roundup Ready® seed" or "Roundup Ready® gene"), which contains the technology protected by U.S. Patent Nos. 5,352,605, 5,633,435, 5,164,316, 5,196,525, 5,322,938 and others assigned to Monsanto (hereinafter "Monsanto's patents") including any crops and seed containing the CP4 EPSPS and/or Cry1–Ac proteins;

2. Prohibited from planting any Roundup Ready® or Bollgard® crop seed in defendants' possession, or under defendants' control, wherever situated;

3. Prohibited from moving, collecting, transferring (except as hereafter provided in paragraph 4) or obtaining in any other manner, the patented "Roundup® resistant," Bollgard® or Roundup Ready® genes or crop seed;

4. Prohibited from cleaning, conditioning, delinting or entering into any contracts or other agreements to clean, condition or agree to catch for others any Roundup Ready®, "Roundup® resistant," or Bollgard® seed covered under Monsanto's patents;

5. Ordered to surrender to Monsanto for storage at Monsanto's expense, pending a final adjudication on the merits, all delinted Roundup Ready®, "Roundup® resistant." and Bollgard® cotton seed to prevent defendants or others under their control from replanting, transferring or otherwise using said infringing seed;

6. Prohibited from using, selling, planting, transferring or harvesting the two (2) loads (25 tons each) of cotton

seed which defendants had delinted by Sinkers in Kennett, Missouri, for replanting in 2001.

7. It is further order that the existing bond in this case will be increased by Monsanto by $100,000.00, making the total bond in this case $200,000.00

IT IS, THEREFORE, ORDERED AND ADJUDGED that the plaintiff's Motion for Preliminary Injunction is well-taken and should be, and hereby is, GRANTED under the foregoing terms and conditions as enumerated above.

### ORDER AMENDING PRELIMINARY INJUNCTION

On March 15, 2001, this Court entered its Order Granting Preliminary Injunction. That Order was filed on March 16, 2001, and its contents, terms and provisions are noted by reference. This matter is now before the Court upon the Emergency Motion of Scruggs Farm Supply that the Order of October 15, 2001, and the Preliminary Injunction granted therein, be clarified or amended.

Scruggs Farm Supply owns and has heretofore operated a cotton gin in Lee County, Mississippi. Scruggs Farm Supply desires to operate that cotton gin in connection with the harvest of the Fall of 2001, and any future years during which the Order Granting Preliminary Injunction may remain in effect. Farmers and growers in the Northeast Mississippi area desire and reasonably need the services provided by the Scruggs Farm cotton gin for the Fall of 2001 and for future years. Given the prevalence of cotton acreage in the area that has been planted with Bollgard cotton seed, or Roundup Ready cotton seed, and/or Bollgard Roundup Ready stacked trait cotton seed, it is probable, if not certain, that many farmers and growers in the area will deliver to the Scruggs

Farm Supply cotton gin, for ginning and processing as in the ordinary custom and practice, cotton that contains Monsanto's patented technologies which are defined more particularly in the Order of March 15, 2001.

The Court having considered the foregoing request of Scruggs Farm Supply, having been advised that Monsanto has no objection thereto, and being of the opinion that the request is within its discretion, is reasonable and should be granted, and the Court being otherwise fully advised in the premises, it is, therefore

ORDERED:

(1) That the Emergency Motion of Scruggs Farm Supply that the Order Granting Preliminary Injunction entered March 15, 2001, and the Preliminary Injunction issued thereupon, be clarified and amended to provide that Scruggs Farm Supply may operate its cotton gin, in the ordinary course and practice of such a cotton gin, in connection with the harvest of the Fall of 2001, and of any future years during which the Preliminary Injunction may remain in effect, shall be granted, subject to the following terms and conditions;

(2) That the receipt, possession and ginning by Scruggs Farm Supply, or any of its officers, managers, agents or employees, of cotton which is delivered by farmers or growers for ginning, in connection with the harvest of the Fall of 2001, and of any future years during which this Preliminary Injunction may remain in effect, which cotton may have been produced from Roundup Ready cotton seed or Bollgard cotton seed or Bollgard Roundup Ready stacked trait cotton seed, which seed contains the technology that Monsanto claims is protected by U.S. Patent Nos. 5,352,605, 5,633, 435, 5,164,316, 5,196,525, 5,322,938 and others assigned to Monsanto

(hereinafter "Monsanto's patents"), including any crops and seed containing the CP4 EPSPS and/or Cry 1–Ac proteins, is excepted from the prohibitions of the Order Granting Preliminary Injunction, and by ginning such cotton as in the ordinary custom and practice of the operation of a cotton gin, Scruggs Farm Supply and/or its officers, managers, agents and employees shall not have committed acts or engaged in activities which are a violation of the Preliminary Injunction, or any provision or prohibition thereof;

(3) That the prohibitions of the Order Granting Preliminary Injunction, and particularly including those set forth in paragraphs 1, 3 and 4 thereof, are and shall hereafter be deemed clarified and amended consistent with this Order;

(4) That Monsanto shall have the right of entry upon the gin premises at reasonable times mutually convenient to the parties for purposes of inspection, testing and sampling to enable Monsanto to ascertain that Scruggs Farm Supply is engaging in no activities prohibited by the Order Granting Preliminary Injunction, except those which are expressly authorized by this Order;

(5) That in connection with the operation of its cotton gin as aforesaid, Scruggs Farm Supply:

(a) shall maintain a list of the farmers for whom it catches cotton seed and this list will be made available to Monsanto upon reasonable notice and request;

(b) shall test each load of cotton, with respect to which it has been requested to, and from which it plans to, catch cotton seed, for the presence of Monsanto's patented biotechnology and keep an accurate ledger documenting the results of each such test; and

(c) shall retain a field sample, contained in standard two pound bags, of cotton bolls from each load of cotton for which the seeds are caught and mark those samples with the date of catching, the name of the farmer who brought the seed in for catching, and the results of Scruggs Farm Supply's testing for the presence of Monsanto's patented biotechnology.

(6) That this Order and its terms and provisions shall be deemed a part of the Order Granting Preliminary Injunction *nunc pro tunc* March 15, 2001, and that, except as otherwise provided herein, the Order Granting Preliminary Injunction entered March 15, 2001, shall remain in full force and effect; and

(7) That nothing provided herein shall adjudge or affect the rights of the parties *vel non* with respect to those issues presently pending before the Court on other motions asking the Court to consider other issues related to or arising out of the Order Granting Preliminary Injunction.