**ARIZONA CARTRIDGE REMANUFACTURERS ASSOCIATION, INC., Plaintiff,**

v.

**LEXMARK INTERNATIONAL, INC., et al., Defendants.**

**No. C 01–4626 SBA.**

United States District Court, N.D. California.

Sept. 30, 2003.

Eugene L. Hahm, Jeremy R. Bader, Michael Lee Smith, Ronald S. Katz, Manatt, Phelps & Phillips, LLP, Palo Alto, CA, Michael T. Brown, Manatt, Phelps & Phillips, LLP, Washington, DC, for Plaintiff.

J. Thomas Rosch, James L. Day, Richard B. Ulmer, Jr., Latham & Watkins, San Francisco, CA, for Defendant.

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ARMSTRONG, District Judge.

This matter comes before the Court on the Motion for Partial Summary Judgment of Plaintiff Arizona Cartridge Remanufacturers Association ("ACRA") and the Motion for Summary Judgment of Lexmark International, Inc ("Lexmark").

Having read and considered the arguments presented by the parties in the papers submitted to the Court, and the arguments presented by counsel at the September 9, 2003 hearing, the Court hereby DENIES ACRA's Motion for Partial Summary Judgment and GRANTS Lexmark's Motion for Summary Judgment.

# I. BACKGROUND

This is not a patent case. At least, that is what ACRA would have this Court believe. This is a case about deceptive advertising; about how Lexmark has deceived customers into believing that they are subject to a post-sale condition that, as a matter of law, is unenforceable. Whether or not it is, however, hinges on whether or not it falls within Lexmark's patent rights. This may not be a patent case, but to determine whether or not Lexmark has engaged in deceptive and unfair business practices the Court must analyze this case under the rubric of patent law.

## A. *Facts*

ACRA is an association of remanufacturers who obtain, refill, refurbish or remanufacture used toner cartridges for laser printers. Empty cartridges are the "lifeblood" of this industry. (Compl.¶ 20.)

Lexmark manufactures and sells laser printers and compatible toner cartridges. In the printer market, Lexmark competes with other manufacturers such as Hewlett–Packard, Canon, and Brother. (Hahm Declaration In Support of ACRA's Motion for Partial Summary Judgment ("Hahm Decl. 1"), Exhs. A and B.) Each printer brand uses unique toner cartridges. (ACRA Opp'n. to Lexmark's Mot. For Summ. J. ("ACRA's Opp'n") at 3.) Cartridges manufactured for Hewlett–Packard printers, for example, cannot be used in Lexmark printers. *Id.* Although some printer manufacturers allow other "original equipment manufacturers" to manufacture cartridges for use in their printers, Lexmark does not. *Id.* In other words, the only cartridges that may be used with a Lexmark brand printer are those manufactured by Lexmark itself. The parties agree that Lexmark's purchasers are, for the most part, businesses. (ACRA Compl. ¶ 13; Yaro Decl. ¶ 3.)

Replacement cartridges for laser printer toners is a lucrative market. According to a Lexmark study, customer expenditures for cartridges over a five-year period are as much as 400% more than the printer cost for monochrome printers and 800% more than the printer cost for color printers. (Hahm Declaration In Support of ACRA's Opposition To Lexmark's Motion For Summary Judgment ("Hahm Decl. 2"), Exh. D (LXK103047).)

The heart of ACRA's complaint for misleading statements and unfair business practices arise out of three programs that Lexmark has initiated: the Prebate program, Lexmark's threats of litigation, and Lexmark's implementation of a lock-out chip.

## 1. *The Prebate Program*

On or about May 1997, Lexmark began offering consumers two different price programs for its toner cartridges: non-Prebate and Prebate. Under the non-Prebate program, purchasers buy the cartridges at a set price, without any restrictions, and may dispose of the cartridges as they wish. Under the Prebate program, purchasers who agree to use the cartridges only once and return their empty cartridges only to Lexmark receive an up-front rebate of around $30. While neither party disputes that the non-Prebate cartridges are more expensive than the Prebate cartridges, ACRA attributes the difference to a surcharge that Lexmark places on the non-Prebate cartridges. Lexmark attributes the difference to the special or discounted price that consumers receive from the Prebate.

Lexmark states that it initiated the Prebate program for three reasons. First, it had decided to throw its hat into the remanufacturing market. To do so, it needed to obtain empty cartridges from customers. (Lexmark Mot. for Summ. J.

("Lexmark Mot.") at 4.) Second, it was concerned that toner cartridges remanufactured by third parties would be inferior and would damage Lexmark's reputation. (*Id.* at 5.) Third, in keeping with its commitment to protecting the environment, Lexmark believed that the Prebate option would induce more customers to return empty cartridges for remanufacturing and recycling. (*Id.* at 6.)

Lexmark does not always sell its cartridges directly to consumers. In many cases, it sells its cartridges to a distributor, who in turn sells them to a retailer, who then sells them to a consumer. (ACRA Mot. For Summ. J. ("ACRA Mot.") at 6).

Because a consumer receives the Prebate at the point of purchase, a consumer will enjoy the reduced purchase price irrespective of whether he or she actually returns the empty cartridge to Lexmark. (ACRA Mot. at 3). Approximately 50 percent of the cartridges sold under Prebate are returned. (Lexmark Mot. at 5.)

Originally, packaging on Lexmark's Optra S Prebate cartridge read:

> **IMPORTANT! READ BEFORE OPENING.** Opening this package or using the cartridge inside confirms your acceptance to the following license agreement. **License Agreement**: Patented cartridge inside sold subject to a **Single Use Only restriction.** It is a **violation** of this agreement and/or it is unlawful to resell, reuse, refill or remanufacture. If you don't agree, return unopened package to point of purchase.

(Hahm Decl.1, Exh. D (LXK 101984) (emphasis in original).)

The wording of the Prebate program has undergone some modifications and currently reads as follows:

> **Please read before opening.** Opening this package or using the patented cartridge inside confirms your acceptance of the following license/agreement. This patented cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available.

(Hahm Decl. 1, Exh. D (LXK 101984).)

ACRA contends that Lexmark's Prebate program misleads consumers. (ACRA Mot. at 1.) ACRA argues that the Prebate mischaracterizes the transaction between Lexmark and the consumer as a license. Consumers are under the impression that they do not own the cartridges outright and cannot dispose of them as they wish. *Id.* Believing that they are legally obligated to do so, consumers return the used cartridges to Lexmark instead of sending them to remanufacturers. ACRA contents that this increases the supply of used cartridges for Lexmark itself to remanufacture to the detriment of remanufacturers.

Lexmark characterizes the Prebate as a legitimate post-sale restriction.

#### 2. *Threats of Litigation*

Lexmark has not attempted to enforce the terms of the prebate against consumers. It has not assessed any penalty on consumers who do not return empty Prebate cartridges. (Yaro Dep at 130:5–17.) In its original "Customer Q's and A's" flyer, Lexmark stated that "[t]he Prebate License Agreement does not require that you return your empty [cartridge] to Lexmark." (Hahm Decl. 1, Exh. D (LXK 201586).) More recent marketing collateral side-steps the issue. Lexmark's website regarding the Prebate program features the frequently asked question, "What if I don't return the Prebate cartridge?" (Hahm Decl. 1, Exh. F.) Lexmark's re-

sponse is "Why wouldn't you? It's free. It's easy. It's the right thing to do." (*Id.*)

While Lexmark has not enforced the Prebate terms against consumers, it has attempted to do so against third-party re-manufacturers who acquire the Prebate cartridges. For example, it has sent letters stating "[t]he use of the Lexmark Prebate toner cartridge is a violation of Lexmark's license and results in infringement of our patents." (Hahm Decl.2, Exh. V.)

### 3. *The Lock–Out Chip*

One of the latest innovations Lexmark has made to its printer cartridges is the addition of an encoding wheel and a chip, which ACRA characters as a "lock out" chip. The encoding wheel monitors the toner level in the cartridge and warns the consumer when the toner level is low. (Lexmark Mot. at 16.) Lexmark added the microchip to the Optra SE and Optra T line of cartridges to free up cartridge space that could be used to increase toner fill without reducing operational quality. (Ream Decl. ¶ 4.) On Prebate cartridges for the Optra SE and Optra T cartridge lines, the chip also disables a printer from using a Prebate cartridge that was remanufactured by a third party. (Ream Depo. at 33:15–21.) If the lock-out chip determines that additional toner has been added to the cartridge or that the cartridge is printing more than expected, the chip electronically disables the printer. (ACRA's Opp'n. at 17.)

In the Eastern District of Kentucky, Lexmark has won a judgment against a defendant who, in helping remanufacturers circumvent the lock-out chip, violated Lexmark's copyright in the chip. *Lexmark International, Inc. v. Static Control Components, Inc.,* 253 F.Supp.2d 943 (E.D.Ky. 2003).

### B. *PROCEDURAL HISTORY*

In its complaint, ACRA filed for a claim for preliminary and permanent injunctive relief and restitution under California Business and Professions Code Sections 17500 and 17200 (the "Complaint"). Count One of the Complaint alleges that Lexmark's Prebate program constitutes deceptive, false and misleading advertising under Cal. Bus. And Prof.Code Sect. 17500. In particular, ACRA alleges that Lexmark misled the public by stating that the Prebate program benefitted consumers, provided a discounted price, and was better for the environment. Count Two of the Complaint alleges that the Prebate program and the lock-out chip constitute unfair competition as defined by Cal. Bus. And Prof.Code Sect. 17200. Finally, Count Three of the Complaint alleges that Does 1–10 conspired with Lexmark to violate Business and Professions Code Sections 17200 and 17500.

The Court set a deadline to complete discovery by June 30, 2003. (Order for Pretrial Preparation § A.) Subsequently, Lexmark filed a motion for summary judgment, which has been fully briefed. In its motion, Lexmark asks the Court to find that it did not make specific statements attributed to it or that those statements were actually true.

ACRA filed its own motion for partial summary judgment, which has been fully briefed. At issue in ACRA's motion is whether, as a matter of law, a post-sale single-use condition is unenforceable such that Lexmark has violated California's False Advertisement and Unfair Competition Statutes in imposing one. The parties fully briefed the motions and argued them before this Court on September 9, 2003.

## II. *LEGAL STANDARD*

### A. *Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment may be granted

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth . . . specific facts showing that there is a genuine issue for trial." *T.W. Electrical Service, Inc. v. Pacific Elec. Contractors*, 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a "light most favorable to the nonmoving party." *T.W. Electrical*, 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Summary judgment may issue "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where the moving party "bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence were uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir.1992) (citations omitted).

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Cvi.P. 56(e); *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

**B.  CALIFORNIA BUSINESS AND PROFESSIONAL CODE § 17200 and § 17500**

California Business and Professions Code Sect. 17200 et. seq., is a broad remedial statute that can be used to challenge wrongful business conduct in whatever context such activity might occur. *Cel–Tech Communications v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 181, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). The statute prohibits "unfair competition," which it expansively defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. . . ." Calif. Bus. Prof.Code § 17200.

■ Under Section 17200, where the parties are direct competitors and the plaintiff alleges the unfair business practice is anticompetitive, then "unfair means conduct that threatens an incipient violation of antitrust law, or violates the policy or spirt of one of those laws because its effects are comparable or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech*, 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.

■ Where a plaintiff alleges that a business practice is unfair because it harms consumers, unfairness involves "an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weight the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Motors, Inc. v. Times–Mirror Co.,* 102 Cal.App.3d 735, 740, 162 Cal.Rptr. 543 (1980).

California Business and Professions Code Section 17500 provides that:

> It is unlawful for any person, firm, corporation or association, . . . . to dispose of real or personal property . . . , to make or disseminate or cause to be made or disseminated before the public in this state, . . . any statement, concerning such real or personal property or services, . . . , which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

Calif. Bus. Prof.Code § 17500.

Any violation of Section 17500 necessarily violates Section 17200. *Kasky v. Nike, Inc.* (2002) 119 Cal.Rptr.2d 296, 27 Cal.4th 939, 45 P.3d 243, as modified, *rehearing denied, cert. granted* 537 U.S. 1099, 123 S.Ct. 817, 154 L.Ed.2d 767, *cert. dismissed as improvidently granted* 123 S.Ct. Thus, a misleading statement is an unfair business practice.

The primary evidence in a false advertising case is the advertising itself. *Brockey v. Moore,* 131 Cal.Rptr.2d 746, 107 Cal. App.4th 86 (2003).

■ With respect to claims of false advertising, both statutes are interpreted broadly. "By their breadth [the statutes] encompass not only those advertisements which have deceived or misled because they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive . . . . A perfectly true statement couched in such a manner that is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections." *Day v. AT & T Corp.,* 63 Cal.App.4th 325, 332–333, 74 Cal.Rptr.2d 55 (1998).

■ California courts apply the "reasonable consumer" standard in determining whether a practice is likely to deceive. *Lavie v. Procter & Gamble Co.,* 129 Cal. Rptr.2d 486, 105 Cal.App.4th 496 (2003). Where the practice is targeted to a sophisticated purchaser, "the question of whether it is misleading to the public will be viewed from the vantage point of members of the targeted group, not others to whom it is not primarily directed." *Id.* at 498, Cal.App.4th at 512.

■ The plaintiff bears the burden of proving that the defendant's practice is false or misleading. *National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* 133 Cal.Rptr.2d 207, 107 Cal.App.4th 1336 (2003). Judicial interpretations of the Federal Trade Commission Act have persuasive force for purposes of interpreting California's Unfair Competition Statutes. *Lavie,* 129 Cal. Rptr.2d 486, 105 Cal.App.4th 496 (2003).

The parties dispute the correct legal standard for reviewing deceptive practices under Sections 17200 and 17500. Lexmark contends that the statement must have been material to be actionable. ACRA contends that there is no such materiality requirement. Neither Section 17200, Section 17500 nor the case law use the term "material." Lexmark seems to have inferred a materiality requirement based on the statutes' relationship with the Federal Trade Commission ("FTC") guidelines.

Under the FTC guidelines, the three essential elements to deception are: (1) a

practice that is likely to mislead (2) consumers acting reasonably under the circumstances; (3) in a manner that is material such that it is likely to affect the consumer's choice or conduct regarding the product. *In the Matter of Cliffdale Associates, Inc.*, 103 FTC 110, Trade Reg. Rep. (CCH) ¶ 22, 137, 22, 949–950 (1984); FTC Policy Statement on Deception, Trade Reg. Rep. (CCH) ¶ 13, 205 (1983).

California courts have incorporated certain aspects of the FTC guidelines. For example, California courts have adopted the FTC's reasonable person standard. *Lavie*, 105 Cal.App.4th at 504–507, 129 Cal.Rptr.2d 486; *Haskell v. Time*, 857 F.Supp. 1392, 1397, 1399 (E.D.Ca.1994); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995). Although intuitively materiality would appear to be an element, Lexmark has not referred the Court to and the Court itself has not found a single case in which a California court has expressly imposed a materiality requirement.

At the same time, Sections 17200 and 17500 are to be construed broadly. Although the FTC articulated the "material" element in 1983, no California court has expressly adopted it. Thus it remains unclear whether the legislature intended Sections 17200 and 17500 to be broader than the FTC guidelines so as to encompass situations where a statement was deceptive, though not necessarily material to the purchasing decision. The Court need not reach this issue, however, given the Court's conclusion that as a matter of law Lexmark's Prebate is not a deceptive practice.

### III. DISCUSSION: ACRA'S MOTION FOR PARTIAL SUMMARY JUDGMENT

ACRA claims and Lexmark does not dispute that Lexmark invokes its patent rights to impose a single-use condition on Prebate cartridges. "Opening this package or using the patented cartridge inside confirms your acceptance of the following license/agreement...Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling." (Hahm Decl., Exh. D (LXK 101948).)

Essentially, ACRA argues that Lexmark's post-sale condition is a misleading statement because it imposes an obligation upon consumers which it has no right to impose and which consumers have no obligation to honor. ACRA contends that Lexmark cannot impose such a condition because it has exhausted its patent. In a somewhat circular fashion, ACRA explains that the reason Lexmark has exhausted its rights is because the post-sale condition is unenforceable.

To determine whether Lexmark's Prebate imposes an unenforceable post-sale condition, the Court must determine whether the circumstances of the Prebate sale indicate that Lexmark exhausted its patent rights.

### A. THE DOCTRINE OF EXHAUSTION

A patent grants the owner the right to exclude all others from making, using or selling the patented invention for a certain period of years. *See, e.g., U.S. v. Dubilier Condenser Corp.*, 289 U.S. 178, 202, 53 S.Ct. 554, 77 L.Ed. 1114 (1933). A patent owner "exhausts" those rights when it sells the patented good. The Supreme Court articulated this doctrine when it stated that "incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it, and upon familiar principles the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold." *United States v. Univis.*

*Lens. Co.,* 316 U.S. 241, 249, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942).

Put another way, when a consumer purchases a patented product, the consumer "has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put." *Hewlett–Packard Company v. Repeat–O–Type Stencil Manufacturing Corporation, Inc.,* 123 F.3d 1445, 1451 (Fed.Cir.1997). This includes the authority to repair a patented device (e.g. refill an empty printer cartridge). *Id.* (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 346, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961)).

However, "only certain circumstances exhaust the seller's patent right and result in an implied license." *Anton/Bauer,* 329 F.3d at 1350. The key to determining whether a patent holder has exhausted its rights turns on whether or not it sold its patented good outright or placed conditions upon the sale. *See, e.g., Mitchell v. Hawley,* 16 Wall. 544, 83 U.S. 544, 548, 21 L.Ed. 322 (1872) (when the sale of a patented good "is *absolute and without any conditions* " the patent holder has exhausted its rights) (emphasis added); *United States v. Masonite Corp.,* 316 U.S. 265, 278, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) (the exhaustion of the patent right depends on "whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article."); *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1105 (Fed.Cir. 2001) ("The *unrestricted* sale of a patented article...'exhausts' the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold.") (emphasis added); *Monsanto Co. v. Scruggs,* 249 F.Supp.2d 746, 753 (N.D.Miss.2001) ("The exhaustion doctrine only applies where the sale or license of

the patented invention is an *unconditional* one." (emphasis in the original)).

In the case of a conditional sale, the purchaser does not receive the same implied license that the purchaser in an unconditional sale receives. Thus, where the purchaser of an unconditional sale has every right to repair the device, the purchaser of a conditional sale does not. *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 709 (Fed.Cir.1992) ("even repair of an unlicensed device [a conditionally sold device] constitutes infringement."). Moreover, the doctrine of exhaustion will "not turn a conditional sale into an unconditional sale." *Id.* at 706.

**B.  *THE CIRCUMSTANCES OF THE SALE***

To determine whether a patent holder exhausted its rights with an unconditional sale or retained them with a conditional one (which some courts define as a license), a court looks to the circumstances of the sale. *See, e.g., Anton/Bauer,* 329 F.3d at 1350 (the circumstances of the sale should *"plainly indicate "* that the patented good was sold and that the buyer, accordingly, inherited the implied license to do with the product as he or she wished) (emphasis added); *Microsoft Corp. v. DAK Industries,* 66 F.3d 1091 (9th Cir.1995) (courts should look to the economic realities of the agreement, not the label the seller places on it).

To illustrate, in *Hewlett–Packard v. Repeat–O–Type Stencil,* the Federal Circuit determined that despite what Hewlett–Packard ("HP") labeled as a single-use condition, it actually sold its printer cartridges unconditionally. 123 F.3d at 1447. More specifically, HP owned numerous patents on a toner cartridge compatible with its HP brand printers. *Id.* HP's instruction manual advised consumers to "discard old print cartridge immediately."

*Id.* Defendant Repeat–O–Type Stencil ("ROT"), however, obtained the used cartridges and refurbished and resold them. In finding that ROT had not infringed HP's patent rights, the court noted that HP had not placed any restrictions on the sale of the cartridges. "A non-contractual intention is simply the seller's hope or wish, rather than an enforceable restriction." *Id.* at 1453. To create a conditional sale, HP had to do more than place the words "discard old print cartridge immediately" in the instruction manual.

In contrast, in *Monsanto Co. v. Scruggs,* the court found that the circumstances of Monsanto's sale of its patented seeds effectively created a conditional sale. 249 F.Supp.2d at 753. Not only did Monsanto place a single use restriction in its licenses with purchasers, it advertised the single use restriction in trade journals, public meetings, and on the product label. *Id.* at 750. Thus, Monsanto was able to enforce the single use restriction.

■ When a patentee sells its products through an intermediary distributor rather than directly to the end-user, the end-user may still be subject to the conditioned sale. The Federal Circuit in *Mallinckrodt* and the District Court in *Monsanto* observed that irrespective of an intermediary, if a purchaser is on notice of a condition and buys the product, the purchaser accepts that condition. The *Mallinckrodt* court and the *Monsanto* court reasoned that under the Uniform Commercial Code § 2–207(2)(c), a license may become a term of sale, even if not part of the original transaction, if not objected to within a reasonable time. *Mallinckrodt* 976 F.2d at 708; *Monsanto,* 249 F.Supp.2d at 754. Thus, Monsanto was able to enforce its single-use condition not only against purchasers who bought the seeds directly from Monsanto, but also against purchasers who bought the seeds from third-parties. *Monsanto* at 754. This Court notes that

the UCC § 2–207(2)(c) has been codified under California statutory law as California Commercial Code § 2–207(2)(c) and that the wording in the California code is identical to the wording in the UCC 2–207(2)(c) and the Miss.Code Ann. § 75–22–07(2)(c).

In a conditional sale, "it is more reasonable to infer that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee." *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1426 (Fed.Cir.1997).

### C. *The Circumstances of the Prebate*

■ Unlike the sale in *Hewlett–Packard,* here Lexmark does not obscure its single-use condition in its instruction manual. It places the Prebate label on the outside of its cartridge boxes. A purchaser picking up the Lexmark box will readily note the words, "Opening this package or using the patented cartridge inside confirms your acceptance of the following license/agreement." Thus, like the purchaser in *Monsanto,* whether it buys directly from Lexmark or indirectly through an intermediary distributor, the Lexmark purchaser is on notice that Lexmark has imposed a single-use condition on the cartridge. Like the purchaser in *Monsanto,* the Lexmark purchaser can reject the condition. The Prebate package states, "[i]f you don't accept these terms, return the unopened package to your point of purchase." If the purchaser returns the Prebate cartridge, it can obtain a non-Prebate cartridge. If the purchaser does not return the Prebate cartridge, then like the purchaser in *Monsanto,* the Lexmark purchaser has accepted the single-use restriction.

Moreover, the Lexmark purchaser has accepted the single-use condition in exchange for a lower price. "This patented cartridge is sold at a special price..." *Cf. Braun* 124 F.3d at 1426. If the purchaser

wishes to obtain a Lexmark cartridge without conditions, it may do so at a price that reflects Lexmark's exhaustion of rights.

In short, the circumstances of the sale indicate: (1) purchasers, including end-users, are on notice of the single-use condition; (2) purchasers have an opportunity to reject the condition; and (3) the Prebate is offered at a special price that reflects an exchange for a single-use condition. Based on these circumstances, the Court concludes that Lexmark has not exhausted its rights. The Prebate is a conditional sale and the single-use condition is enforceable.

### C. *Summary*

By characterizing Lexmark's Prebate as a misleading and unfair business practice under Sections 17200 and 17500, ACRA has attempted to use the doctrine of exhaustion to turn a conditional sale into an unconditional one. This it cannot do. Because of its patents, Lexmark has the right to impose conditions on the sale of its patented product. It may restrict a purchaser's ability to repair it, which is what in essence the single-use condition does. As plaintiff, ACRA bears the burden of pointing to evidence in the record to demonstrate that Lexmark's prebate is a deceptive and unfair practice. Because Lexmark has not exhausted its rights in the Prebate cartridges, ACRA cannot meet this burden. Its Motion for Partial Summary Judgment is, therefore, DENIED.

## IV. *DISCUSSION: LEXMARK'S MOTION FOR SUMMARY JUDGMENT*

At the heart of this dispute is the nature of Lexmark's Prebate program, which pro-

vides consumers a special price for toner cartridges if they agree to return the spent cartridges only to Lexmark for remanufacture or recycling. ACRA's complaint alleges that the Prebate program itself, including: (1) certain statements Lexmark made; (2) its attempts to enforce the terms of the Prebate against third-party remanufacturers; and (3) the placement of the lock-out chip to prevent refurbishing of the Prebate cartridges, are misleading and unfair.

### A. *THE STATEMENTS AT ISSUE IN LEXMARK'S MOTION*

In its Motion for Summary Judgment, Lexmark address each of the statements ACRA listed in its Complaint as evidence of deceptive and misleading statements. Lexmark argues that either it did not make these statements or that the statements are not misleading. The Court reviews the alleged statements from the vantage point of Lexmark's purchasers—businesses.[1] *Lavie* 129 Cal.Rptr.2d at 498, 105 Cal.App.4th at 512.

#### 1. *Lexmark Wants Consumers to Believe Remanufacturing Is Not A Viable Option*

The Complaint alleges that "[a]lthough Lexmark would have consumers believe otherwise, many consumer goods, including laser printer toner cartridges, can be refurbished, refilled, and reused at a fraction of the cost of purchasing a new cartridge and with equal performance for all practical purposes." Compl. ¶ 18.

Lexmark argues that it never made such a statement. As evidence that it did not, Lexmark points to the fact that Lexmark itself sold more than a half-million reman-

---

**1.** The parties agree that Lexmark's purchasers are, for the most part, businesses. (ACRA Compl. ¶ 13; Yaro Decl. ¶ 3, TR. at 53:19–20.) ACRA described Lexmark's purchasers as

"businesses" in its complaint and it failed to provide evidence that Lexmark targeted individual consumers rather than businesses. (TR. at 54 *passim*.)

ufactured cartridges at a lower price than new cartridges in 2002 alone. (Yaro Decl. ¶ 10.)

ACRA counters that the allegation in Paragraph 18 of its Complaint is a non-issue and is not one of the misrepresentations central to its case. (ACRA Opp. at 11.) It does not contradict Lexmark's position.

Accordingly, the Court finds that Lexmark did not make this statement.

### 2. *Prebate Limits Consumer Choice*

■ ACRA alleges that Lexmark's Prebate program "has limited consumer's choices for cartridge" as well as "lessened the number of vendors from whom they can purchase cartridges." (Compl. ¶ 20.)

Lexmark claims that this turns the facts inside out-that the Prebate program actually increased consumer options because now, in addition to purchasing a remanufactured cartridge from members of ACRA, a purchaser can buy them from Lexmark itself. ACRA claims that the Prebate program limits the ability of third parties to remanufacture and sell cartridges in competition with Lexmark. This reduces the choice available to consumers.

The Court has already found, however, that Lexmark's patent rights render the Prebate a legitimate practice. While ACRA contends that 50% of purchasers return the Prebate cartridges to Lexmark, this is not evidence that Lexmark has illegally limited consumer choices, especially when Lexmark continues to offer a non-Prebate cartridge that remanufacturers may refill and resell.

### 3. *Prebate Cartridges Are Sold At A Discount*

ACRA alleges that Lexmark has misrepresented that the Prebate cartridge is sold at a special, reduced price. (Compl. ¶ 21). According to ACRA "the price of the Pre-

bate cartridge is the normal price for a cartridge, and is less expensive only in comparison to a [non-Prebate] cartridge on which a surcharge has been added."

It is within Lexmark's patent right to charge what the market will bear for its patented goods. Neither the Courts nor competitors can regulate that price. Lexmark has never advertised that its Prebate cartridges are less expensive than those of other cartridge manufacturers, like HP or Brother. It has merely stated that its Prebate cartridges are less expensive than its Non–Prebate cartridges, which is correct.

### 4. *Lexmark Did Not Inform Consumers That Single–Use Condition Might Not Be Enforceable*

ACRA alleges that Lexmark "does not inform customers that [the single-use condition] may not be valid in every circumstance and that such 'licenses' have been considered by some courts to be contracts of adhesion..." (Comp. ¶ 22(b).)

Given that the Court has found that Lexmark's single-use condition is enforceable, there is no reason for such an admission. Moreover, there is no evidence in the record to suggest that Lexmark itself thought the single-use condition was unenforceable and sought to hide that from consumers.

### 5. *Lexmark Does Not Enforce The Post–Sale Condition Against Consumers*

■ ACRA alleges that the Prebate program is a sham because most customers do not return the Prebate cartridges and Lexmark "has no mechanism or desire to enforce returns under its Prebate program...[and] it has never taken any enforcement action whatsoever against a non-complying customer..." (Compl. ¶ 22(a).) Lexmark counters that it has

created an enforcement mechanism with the lock-out chip.

What ACRA really seems to be suggesting is that Lexmark's failure to enforce the single-use condition against purchasers demonstrates that Lexmark knew the condition was unenforceable. There is no evidence, however, from which the Court or a trier of fact could extrapolate such an inference, especially when in its papers, Lexmark has demonstrated quite the opposite. Moreover, it is not for the Court to question a patent owner's decision to litigate certain infringement claims and not others. That decision is within the patent owner's purview.

### 6. *The Value Of The Prebate Amount*

ACRA alleges that Lexmark misleads customers to think that the "Prebate amount equals the approximate cost of a used cartridge when...in fact, it is triple that amount to insure that remanufacturers do not have access to the used cartridges..." (Compl.¶ 22(e).) As proof of this unfair pricing, ACRA again points to Lexmark's failure to enforce the single-use condition against purchasers. "If indeed, the 'value' of an empty cartridge approximated the Prebate difference...it is natural to assume that Lexmark would take some steps to enforce the...terms..." (ACRA's Opp'n at 9:21–25.) ACRA asks the Court to construe this to somehow mean that Lexmark "has already been fully paid for the cartridges and is indifferent whether it actually receives a spent cartridge." (ACRA's Opp'n at 9:25–28.) There are no grounds, substantive facts, nor evidence advanced in support of this theory that would lead the Court to construe Lexmark's activities in this manner.

2. Instead ACRA cites to the Yaro Depo. at 133:15–135:3 where Mr. Yaro is asked to look

### 7. *The Prebate Program Is Better For The Environment Than Other Remanufacturers' Programs*

ACRA alleges that Lexmark's representations that the Prebate program helps the environment are false. (Compl. ¶ 34.) In particular, ACRA points to the following statements that appeared on Lexmark's website on September 2001:

- "Lexmark recycles Prebate cartridges, keeping them out of the waste stream."
- "[t]he Prebate program has increased cartridge returns to Lexmark by more than 300 percent."
- "Lexmark's toner cartridges are high-yield cartridges....which ultimately means fewer cartridges have to be manufactured in the first place."

*Id.* ACRA contends that these statements are misleading because "it is false that recycling through the Prebate program (assuming that is done) is any more protective of the environment than recycling or re-use of a used cartridge through a remanufacturer." *Id.*

As Lexmark correctly points out, nowhere in the above statements does Lexmark contend that recycling through the Prebate program is *more* protective of the environment than recycling through a remanufacturer. Lexmark simply states that (1) it recycles Prebate cartridges; (2) the Prebate program has increased cartridge returns and (3) its cartridges are high-yield.

ACRA counters that "the falsity of the Prebate program is not found in the amorphous and subjective statement that Lexmark protects the environment but rather in the false statement that Lexmark recycles or remanufactures one hundred percent of the cartridges returned to it." (ACRA Opp'n at 13). ACRA has not identified where in Lexmark's advertising, however, Lexmark has represented that *one hundred percent* of the cartridges are recycled or remanufactured.[2] It has mere-

at a document marked 105005 (In the Deposition excerpt provided by ACRA, ACRA did not

ly identified statements in which Lexmark says it recycles and remanufactures Prebate cartridges.

### 8. *Non–Prebate Cartridges Were Equally Available*

■ ACRA alleges that:

> [C]onsumers had the option of purchasing either a Prebate or a non-Prebate Optra S toner cartridge, [but] these cartridges were not at all equally available for approximately six months after the Prebate program was announced...Even after the first six months of the Prebate program, the availability of these non-Prebate cartridges was spotty at best.

(Comp.¶ 26).

Lexmark argues first, that the statute of limitations applies to events that occurred within six months after Lexmark originally launched the Prebate program five years before ACRA filed its complaint. Further, Lexmark argues that it never claimed the Prebate and non-Prebate cartridges would be "equally available," only that customers would have the option to buy non-Prebate cartridges. (Lexmark Mem. at 13.) Finally, Lexmark argues that the non-Prebate cartridges were available to satisfy customer demand. (Bryan Decl. ¶ 9; Yaro Decl. ¶ 5; Higgins Dep. 57:12–21; Moulton Dep. 54:9–19.)

At the hearing, ACRA admitted that Lexmark did not use the term "equally available." (Tr. at 86:5–6.) ACRA counters that the issue is not whether the two cartridges were equally available but that in some cases the non-Prebate versions were not available at all. For example, Lexmark does not sell non-Prebate versions of its cartridges for label applications. Yaro Decl. ¶ 5. Lexmark contends

that customers can purchase a fuse that will allow the non-Prebate cartridges.

ACRA also claims that non-Prebate versions of low yield cartridges for each of Lexmark's printer lines are not sold through Lexmark's sales channels. Customers who wish to purchase these cartridges must order them from Lexmark and wait a number of days for the cartridges to be delivered. (ACRA Opp'n. at 10). This does not demonstrate, however, that the non-Prebate cartridges were unavailable.

ACRA next cites to the declaration of one of Lexmark's purchasers who complains that although he requested new printers with non-Prebate cartridges "[t]hat request was not honored." (Fleckner Decl. ¶ 9.) This statement alone, however, does not evidence any deception on Lexmark's part. There is no context provided for the statement, and more importantly, no explanation. Neither the Court nor a trier of fact can extrapolate from this one sentence any deliberate design by Lexmark to thwart the purchaser's access to non-Prebate cartridges.

Moreover, when the Court inquired at the hearing as to whether there was evidence that Lexmark was failing to meet non-Prebate demand, ACRA responded that such evidence was "irrelevant." (Tr.. at 73:18–22.) Given ACRA's prior assertions about the "greater hurdles" Lexmark imposes for non-Prebate cartridges, the Court found ACRA's response rather perplexing.

Nevertheless, reviewing the record as a whole, the most a trier of fact might be able to infer from the facts alleged is that it is easier to purchase a Prebate cartridge or that Lexmark encourages the Prebate

---

identify the document). ACRA's attorney reads out loud a question posted in the document, " 'What happens to the empties I return?' " ACRA's attorney then reads out loud

the answer in the document, " 'Lexmark remanufactures and/or recylcles cartridges.' " The Court will not import the phrase "100 percent" into this statement.

program. Such an inference alone, however, does not support a conclusion that Lexmark's practice imposes such hurdles as to be deceptive or misleading.

### 9. *The Cartridge Reorder Forms Emphasize Prebate Cartridges Over Non–Prebate Cartridges*

ACRA alleges that on cartridge reorder forms. Lexmark emphasizes the Prebate cartridge part number over the non-Prebate cartridge. (Comp.¶ 27). "The Prebate reorder numbers are in significantly larger type face and in a brighter color than the number for the non-Prebate cartridge." *Id.*

Lexmark counters that its consumers are sophisticated businesses and that the non-Prebate cartridge reorder number is legible as well. While Lexmark's reorder forms may emphasize its Prebate cartridges over its non-Prebate cartridges, neither the Court nor a trier of fact could infer from this that Lexmark somehow tricks purchasers into reordering Prebate cartridges.

### 10. *Prebate Cartridges Are Entirely New, Remanufactured Cartridges Are Not New*

Under the heading "Customer FAQS" on Lexmark's web site in September 2001, Lexmark informed consumers that "Prebate cartridges are newly manufactured and contain 100 percent new parts." (Compl.¶ 33.) ACRA alleges that despite this statement, Lexmark is selling remanufactured Prebate cartridges and attaching the Prebate post-sale conditions to them. In addition, ACRA alleges that in order to curry favor with some of its customers, Lexmark is selling new cartridges but telling the customer that the cartridges are remanufactured.

Lexmark counters that on the occasions when it does so, it does not fail to tell the customers. Moreover, Lexmark's con-

tracts with purchasers of remanufactured cartridges expressly state that Lexmark may submit new cartridges if necessary to fulfill the contract. (Bryan Decl. ¶ 11; Yaro Decl. ¶ 9.)

### 11. *Summary*

ACRA alleged that the above ten statements were misleading, but it has failed to raise a genuine issue of material fact that would lead a trier of fact to find that, either individually or as a whole, the statements are mislending.

### B. *Threats of Litigation*

ACRA alleges that as part of its unfair business practices, Lexmark has threatened litigation against third parties who refurbish the Prebate cartridges without authorization. ACRA argues that these threats are "nothing more than a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of Lexmark's competitors." ACRA Opp. at 16 5–7.

The Court has already found that Lexmark's patent rights make its single-use condition enforceable. Accordingly, it is well within Lexmark's right to pursue infringers and contributory infringers. 35 U.S.C. § 271(d)(3) ("No patent owner otherwise entitled to relief from infringement or contributory infringement of a patent shall be ... deemed guilty of misuse ... by reason of his having ... sought to enforce his patent rights against infringement or contributory infringement.").

### C. *The Lock–Out Chip*

ACRA alleges that the chip that appears in the latest Lexmark Prebate cartridges was designed with only one purpose in mind—to lock out Prebate cartridges that have been remanufactured by third parties.

Lexmark has moved for summary judgment on the ground that as a matter of fact and as a matter of law, it has the right to place the lock-out chip in its cartridges. Lexmark, somewhat weakly, argues that the chip serves more than just a lock-out function. It frees up cartridge space that could be used to increase toner fill without reducing operational quality. (Ream Decl. ¶ 4.)

ACRA counters that the primary purpose of the chip is the lock-out function. (ACRA Opp. 17 8–14). That may be so, but ACRA fails to plead facts or citations to authorities that show that a lock-out device is a form of unfair competition. There may be circumstances where it could be—for example in situations where no intellectual property were involved, but all ACRA has done to argue its point is to throw out a conclusory *heading* stating that the chip illegally compels innocent third parties to contract with strangers without their consent. (ACRA Opp. at 16.) It does not develop this heading. Moreover, to the degree that this argument rehashes ACRA's earlier argument that the single-use condition of the Prebate illegally compels end-users to contract with Lexmark, the Court has found to the contrary—the single-use condition does pass to end-users.

### D. *SUMMARY*

Where the nonmoving party carries the burden at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. ACRA brought forth exactly one Lexmark purchaser who complained of being frustrated and dissatisfied. (Fleckner Decl.) Frustration and dissatisfaction, however, do not equate to deception. In light of the Court's ruling that the Prebate condition falls squarely within Lexmark's patent right, Lexmark has adequately shown that there is little if any evidence to support ACRA's contention that the Prebate program is misleading, deceptive or unfair under Sections 17200 and 17500.

In its Complaint, ACRA also alleged that Lexmark conspired to violate Sections 17200 and 17500. There is no independent cause of action for civil conspiracy under California law. *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.,* 122 F.3d 1211, 1228 (9th Cir.1997); *Applied Equipment Corp. v. Litton Saudi Arabia, Ltd.,* 7 Cal.4th 503, 510–11, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994). Thus, just as ACRA's Section 17200 and 17500 claims fail, so to does its conspiracy claim. Accordingly, Lexmark's Motion for Summary Judgment is GRANTED.

### V. *CONCLUSION*

For the foregoing reasons,

IT IS HEREBY ORDERED THAT:

● ACRA'S Motion for Partial Summary Judgment [Docket No. 94] is DENIED;

● Lexmark's Motion for Summary Judgment [Docket No. 86] is GRANTED.

● The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

### JUDGMENT

In accordance with the Court's Order denying Plaintiff's Motion For Partial Summary Judgment and granting Defendants' Motion for Summary Judgment,

IT IS HEREBY ORDERED THAT final judgment is entered in favor of Defendants on all of plaintiff's claims for relief. All matters calendared in this action are VACATED. The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.