**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA CARTRIDGE
REMANUFACTURERS ASSOCIATION
INC., an Arizona not-for-profit
corporation, individually, and on
behalf of its members and the
general public,
              *Plaintiff-Appellant,*

              v.

LEXMARK INTERNATIONAL INC., a
Delaware corporation,
              *Defendant-Appellee.*

No. 03-16987

D.C. No.
CV-01-04626-
SBA/JL

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
March 17, 2005—San Francisco, California

Filed August 30, 2005

Before: Sidney R. Thomas and Raymond C. Fisher,
Circuit Judges, and James L. Robart, District Judge.*

Opinion by Judge Fisher

---

*The Honorable James L. Robart, United States District Judge for the
Western District of Washington, sitting by designation.

## COUNSEL

Ronald S. Katz, Eugene L. Hahm, Manatt, Phelps & Phillips, LLP, for the plaintiff-appellant.

J. Thomas Rosch, James L. Day, Richard B. Ulmer Jr., Latham & Watkins, for the defendant-appellee.

**OPINION**

FISHER, Circuit Judge:

Appellant Arizona Cartridge Remanufacturers Association ("ACRA"), an association of wholesalers that sell remanufactured printer cartridges, appeals the grant of summary judgment to cartridge-maker Lexmark on claims that Lexmark engaged in deceptive and unfair business practices in violation of California law. The dispute arises from Lexmark's advertising of its "Prebate" program, under which it gives purchasers an upfront discount in exchange for their agreement to return the empty cartridge to Lexmark for remanufacturing — a form of post-sale restriction on reuse. ACRA claims that Lexmark's advertising and promotional materials mislead customers into thinking the post-sale restriction is enforceable and that they actually receive a discounted price for the special cartridges. We agree with the district court that ACRA has not offered evidence that Lexmark's advertisements constitute deceptive or unfair business practices and affirm the grant of summary judgment in favor of Lexmark.

I.

Lexmark, spun off from IBM in 1991, makes and sells laser printers and toner (printer) cartridges. ACRA represents wholesalers that remanufacture emptied Lexmark printer cartridges for reuse. Before 1997, Lexmark did not compete against ACRA's members because it sold only new replacement printer cartridges. In 1997, however, Lexmark began to remanufacture its own cartridges and launched an aggressive new strategy to improve its position in the market for remanufacturing the used cartridges. Most notably, the company introduced its "Prebate" program — a play on the word "rebate" — which gives consumers an upfront discount on printer cartridges. The Prebate cartridges cost consumers on average 30 dollars (or 20 percent) less than a regular car-

tridge. In return, Lexmark requires the consumer to return the depleted cartridge to Lexmark or its agent.

The Prebate cartridge package sets forth the following license agreement on the outside of the package:

> **RETURN EMPTY CARTRIDGE TO LEX-MARK FOR REMANUFACTURING AND RECYCLING**
>
> Please read before opening. Opening of this package or using the patented cartridge inside confirms your acceptance of the following license agreement. The patented cartridge is sold at a special price subject to a restriction that it may be used only once. Following this initial use, you agree to return the empty cartridge only to Lexmark for remanufacturing and recycling. If you don't accept these terms, return the unopened package to your point of purchase. A regular price cartridge without these terms is available[1]

Consumers can opt to buy Lexmark cartridges without the Prebate post-sale restriction, but at the higher price.[2]

---

[1]The packaging when the Prebate program was launched in 1997 contained slightly different language:

> **IMPORTANT! READ BEFORE OPENING**. Opening this package or using the cartridge inside confirms your acceptance to the following license agreement. **License Agreement:** Patent cartridge inside sold subject to **Single Use Only restriction**. It is a **violation** of this agreement and/or it is **unlawful to resell, reuse, refill or remanufacture.** If you don't agree, return unopened package to point of purchase.

[2]According to Lexmark, its post-sale restriction on reusing the Prebate cartridges does not require consumers to return the cartridge at all; it only precludes giving the cartridge to another remanufacturer. The plain language of the contract does not clearly reflect this position. However, the distinction drawn by Lexmark is unnecessary to our resolution of the present case, which is not a direct challenge to the terms of the contract itself.

Lexmark asserts that it devised the Prebate program to boost its competitive position in the remanufacturing market, to preserve the quality of the product offered consumers and to be environmentally conscious by recycling used cartridges. Lexmark advertises the program in packaging, media and on the company's Web site. *Id*. It pays a fee to authorized resellers who collect and return empty cartridges.

The program has been successful. The company estimates that 50 percent of the cartridges sold are returned as empty cartridges to Lexmark, and cartridge returns have increased by 300 percent since the implementation of the Prebate program. Additionally, from 1997 to 2001, Lexmark's cartridge sales in the United States increased by nearly 100 percent and its sale of printers that use Prebate cartridges increased by 60 percent.

ACRA filed this diversity action against Lexmark in federal district court, alleging that several of the company's statements regarding the terms and benefits associated with purchasing a Prebate cartridge are false and violate California's unfair competition laws. Most important for purposes of this appeal, ACRA argued that Lexmark deceptively suggests that the conditions placed on the outside of the Prebate package create an enforceable agreement with consumers to return used cartridges. ACRA also contended that Lexmark misleads consumers by falsely promising that they will save money when purchasing Prebate cartridges, when in fact Lexmark cannot control the price charged by retailers. Finally, ACRA's complaint challenged Lexmark's use of a so-called "lock-out" chip as an unfair business practice.[3]

---

[3]The Sixth Circuit described the chip's functioning as a "secret handshake" between the printer and the chip in each cartridge. *Lexmark Int'l v. Static Control*, 387 F.3d 522, 530 (6th Cir. 2004) (addressing copyright infringement action against rival chip maker). "If the two values do not match each other, the printer returns an error message and will not operate, blocking consumers from using toner cartridges that Lexmark has not authorized." *Id*.

The district court concluded that Lexmark's Prebate program advertising is not deceptively false. *Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Int'l, Inc.*, 290 F. Supp. 2d 1034, 1049 (N.D. Cal. 2003). It found that the company could legally enforce the post-sale restriction under a Federal Circuit decision allowing patent holders to limit the use of their products after sale. *Id.* at 1042-45 (citing *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 (Fed. Cir. 1992)). The court further found that Lexmark's restriction created a valid agreement with consumers and that Lexmark's claim of discount pricing accurately reflects its sales practice. *Id.* at 1045-46. It also found that ACRA failed to establish that Lexmark's use of the lock-out chip amounts to unfair competition. *Id.* at 1049-50.

## II.

We review the district court's grant of summary judgment de novo. *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001). We must determine, by "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.*

## III.

Although this case involves our consideration of important questions of patent and contract law, at its core the dispute between Lexmark and ACRA reduces to state claims of unfair competition and misleading business practices related to Lexmark's advertising. The key issue here is whether Lexmark misleads consumers and engages in unfair competition when it advertises cartridges for sale at a reduced price but with restrictions on their use. ACRA sues under two California laws that provide broad consumer protection for misleading and unfair practices by businesses. California Business and Professions Code § 17500 makes it unlawful for a business to

disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading. . . ." In turn, California Business and Professions Code § 17200, *et seq.*, prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by" § 17500.[4] To state a cause of action under § 17500 for injunctive relief requires a showing that members of the public are likely to be deceived, but does not call for a showing of "[a]ctual deception or confusion caused by misleading statements." *Day v. AT & T Corp.*, 74 Cal. Rptr. 2d 55, 59 (Cal. Ct. App. 1998). The law encompasses not just false statements but those statements "which may be accurate on some level, but will nonetheless tend to mislead or deceive. . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under these sections." *Id.* at 60. The plaintiff has the burden of proving that the challenged advertising is false or misleading to a reasonable consumer. *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*, 133 Cal. Rptr. 2d 207, 214 (Cal. Ct. App. 2003).

---

[4]California's Proposition 64, passed in November 2004, amended the statute to prohibit unaffected plaintiffs from bringing suit on behalf of the general public. Cal. Bus. & Prof. Code § 17204. Under this change, ACRA may lack standing to assert that Lexmark is deceiving consumers or engaging in unfair competitive practices that harm consumers. However, California courts are split on whether this requirement applies retroactively to cases that have not been fully adjudicated. *Compare Bivens v. Corel Corp.*, 24 Cal. Rptr. 3d 847 (Cal. Ct. App. 2005) (finding plaintiff lacked standing because it was not affected), *review granted*, 110 P.3d 1218 (Cal. 2005), *with Californians for Disability Rights v. Mervyn's, LLC*, 24 Cal. Rptr. 3d 301 (Cal. Ct. App. 2005) (finding the standing requirement to apply only prospectively), *review granted*, 110 P.3d 1216 (Cal. 2005). Because we affirm the district court's grant of summary judgment, we do not address the effect of Proposition 64 on ACRA's claim, if any.

"Unfair competition" under § 17200 "means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). Section 17200 is not limited to anticompetitive business practices targeted at rivals, "but is equally directed toward the right of the public to protection from fraud and deceit," *Comm. On Children's Television, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 667 (Cal. 1983) (internal quotation marks and emphasis omitted) (quoting *Barquis v. Merchants Collections Ass'n*, 496 P.2d 817, 828 (Cal. 1972)), and permits "courts to enjoin ongoing wrongful business conduct in whatever context such activity might occur," *id.* A violation of the false advertising law automatically gives rise to a violation of the unfair competition provision. *Id.* at 668.

ACRA argues that specific statements made by Lexmark in conjunction with its Prebate program — offering cheaper cartridges that come with restrictions on their reuse — violate §§ 17200 and 17500. We address these allegedly offending statements — the focus of ACRA's appeal — in turn.

## A.   *Enforceability of Post-Sale Restriction*

ACRA contends that Lexmark engages in false advertising and unfair competition by telling consumers they have a legal obligation to honor the post-sale restriction printed on the outside of the cartridge package, when in fact they are not legally compelled to do so. Under ACRA's theory, Lexmark cannot enforce the post-sale conditions and to suggest otherwise violates California's consumer protection laws. To satisfy its burden on summary judgment, ACRA essentially must show that Lexmark has no legal basis for the restriction featured in its advertising. We agree with the district court that ACRA has failed to make such a showing.

1. *Patent Law*

**[1]** The district court found that Lexmark could condition the use of its patented Prebate cartridges by consumers under the principle articulated by the Federal Circuit in *Mallinckrodt, Inc. v. Medipart, Inc.*, which held that a restriction on a patented good is permissible as long as it is "found to be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims." 976 F.2d at 708. A condition is impermissible where "the patentee has ventured beyond the patent grant and into behavior having an anticompetitive effect not justifiable under the rule of reason." *Id.* (remanding for a determination of whether the patentee's single-use restriction on its medical device was reasonable and within the scope of its patent); *see also Monsanto Co. v. McFarling*, 302 F.3d 1291, 1298-99 (Fed. Cir. 2002) (upholding infringement injunction against farmer who purchased patented seeds under an agreement that the seeds be used for "planting a commercial crop only in a single season," and who then replanted the seeds); *B. Braun Med., Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (concluding that although typically "an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter," this does not hold true where the patentee specifically places restrictions on the sale of the item).

Applying the *Mallinckrodt* principle, the district court determined that Lexmark imposed an enforceable condition on the Prebate printer cartridges because Lexmark's patent rights were not exhausted. *Arizona Cartridge*, 290 F. Supp. 2d at 1045. On appeal, ACRA does not challenge the district court's reliance on *Mallinckrodt* or the validity of the Federal Circuit's decision, nor does it argue that Lexmark is acting beyond the scope of its patent.[5] In fact, ACRA concedes that

---

[5]The Electronic Frontier Foundation, in its amicus brief, argues that *Mallinckrodt* was wrongly decided and urges us to reject explicitly the

the otherwise unfettered use of a patented good can be constrained. [Blue Brief at 21]. But to do so, ACRA contends, the patent holder must have a valid contract with the consumers of its product.

## 2. *Contract Law*

**[2]** ACRA thus asks us to conclude that Lexmark lacks a valid contract with consumers to limit the post-sale use of the cartridge. California law, adopting the relevant Uniform Commercial Code provisions, establishes that a "contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Cal. Com. Code § 2204(1). Additionally, California law provides that an "agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." *Id.* at § 2204(2).

**[3]** We agree with the district court that Lexmark has presented sufficient unrebutted evidence to show that it has a facially valid contract with the consumers who buy and open its cartridges. Specifically, the language on the outside of the cartridge package specifies the terms under which a consumer may use the purchased item. The consumer can read the terms and conditions on the box before deciding whether to accept them or whether to opt for the non-Prebate cartridges that are sold without any restrictions.

The district court found that the ultimate purchasers of the cartridge — consumers — had notice of the restrictions on use and had a chance to reject the condition before opening the clearly marked cartridge container. *Arizona Cartridge*,

Federal Circuit's reasoning. However, ACRA has not challenged the district court's reliance on or application of *Mallinckrodt*. Thus, we need not pass on the merits of the Federal Circuit's decision for resolution of the case before us.

290 F. Supp. 2d at 1044-45. These findings support the conclusion that the consumer accepts the terms placed on usage of the Prebate cartridge by opening the box.[6]

[4] In exchange for agreeing to the restricted use of the cartridge, consumers receive consideration in the form of the price discount.[7] The district court explicitly found that "the Prebate is offered at a special price that reflects an exchange for a single-use condition." *Arizona Cartridge*, 290 F. Supp. 2d at 1045. ACRA argues that because Lexmark distributes its cartridges through wholesalers, it has no way to ensure that consumers actually receive the price discount, but offers no factual support for this contention. Lexmark presented evidence that market forces compel wholesalers to pass the discount on to consumers. A regional manager of one supplies retailer said it would be hard, albeit not impossible, for the wholesaler to skim the discount off as profit for itself by passing on only a portion of the discount from Lexmark to the consumer. But he said, "in a very competitive wholesale distribution market, there are too many competitors, really, to be able to do that." Furthermore, the Prebate notice printed on

---

[6]This case is different from those instances in which a consumer lacks notice of the condition at the time of purchase. *See, e.g.*, *Step-Saver Data Sys. v. Wyse Tech.*, *Inc.*, 939 F.2d 91, 105 (3d Cir. 1991) (treating box-top license as an additional term not incorporated into the parties' contract where the term's addition to the contract would materially alter the agreement and the consumer did not see license until after paying for product). Another variant involves "shrinkwrap licenses" on software, which impose restrictions that a consumer may discover only *after* opening and installing the software. *See e.g., ProCD v. Zeidenberg*, 86 F.3d 1447, 1452-53 (7th Cir. 1996) (holding that contract included license agreement terms that appeared on screen even though they came after user had purchased, opened and installed software).

[7]Lexmark represents that it has not taken legal action against any user for failing to return a cartridge to Lexmark because it "assumes customers will be honest and send cartridges back." To the extent that Lexmark fails to enforce its Prebate policy, a consumer receives the benefit of the bargain through the price reduction without necessarily having to carry through on its obligation to return the cartridges to Lexmark.

the cartridge informs consumers that they can purchase a regular cartridge without the restriction at the regular price; the notice specifically states that a "regular price cartridge without these terms is available." ACRA has failed to rebut this evidence to create a triable issue of fact.

**[5]** ACRA's argument that no enforceable agreement exists because there is no privity of contract also fails. ACRA cites a California case stating "the general rule that one may not sue upon a contract unless he is a party to that contract." *Watson v. Aced*, 156 Cal. App. 2d 87, 91 (Cal. Ct. App. 1957). The privity requirement is met here, because the consumer *is* a party to the contract with Lexmark. As described above, the contract is formed when the final purchaser opens the cartridge box with notice of the restriction on reuse. ACRA contends, however, that the lack of privity is shown by Lexmark's inability to ensure that consumers will receive the price-reduction benefit of the Prebate program. We have already explained why ACRA has failed to show that consumers do not pay a reduced price. It does not matter that this price discount results from distributors choosing to pass along their savings — the consumer still receives consideration for agreeing to the restriction.

**[6]** We hold that the contract on its face appears to be enforceable based on the district court's findings that consumers (1) have notice of the condition, (2) have a chance to reject the contract on that basis and (3) receive consideration in the form of a reduced price in exchange for the limits placed on reuse of the cartridge.[8] The contract permits Lexmark to restrict the use of its patented item and gives Lexmark a legal basis for asserting its ability to enforce its restriction. Therefore, ACRA has not raised a triable issue of fact that Lexmark's advertising statements as to its Prebate program are false, mislead or tend to deceive consumers or

---

[8]Our holding here does not preclude challenges to the contract that a customer — which, unlike ACRA, is a party to the contract — could raise.

that they constitute a form of unfair competition. *See Day*, 63 Cal. Rptr. 2d at 59-60.

## B.   *Lexmark's Statements as to Price Reduction*

ACRA contends that Lexmark's advertising is misleading in promising consumers a price reduction for buying a Prebate rather than a regular cartridge, because Lexmark cannot guarantee consumers will pay less for a Prebate cartridge. We have already rejected this argument. *See supra* Section III.A.2.

ACRA further alleges that Lexmark engages in deceptive advertising and unfair competition by suggesting that the price difference between Prebate and non-Prebate cartridges approximates the value of an empty cartridge. According to ACRA, Lexmark wants consumers to believe that the Prebate discount reflects the benefit that accrues to Lexmark by getting an empty cartridge back. We agree with the district court that nothing in the record supports ACRA's claim. *Arizona Cartridge*, 290 F. Supp. 2d at 1047.

## C.   *Use of the Lock-Out Chip*

**[7]** ACRA argues that Lexmark's use of the lock-out chip, which prevents consumers from having their Prebate cartridges remanufactured by a different company, is anticompetitive and is intended to preclude competition in the aftermarket. The district court found ACRA's claim that the lock-out chip is a form of unfair competition to be unsupported by facts or legal authority, as do we. *Id.* at 1050. As discussed above, the district court relied on the Federal Circuit's *Mallinckrodt* decision to find that Lexmark could restrict the post-sale use of its patented cartridge. ACRA has not challenged the court's determination or alleged that Lexmark is acting beyond the scope of its patent in imposing a condition that it uses the lock-out chip to enforce. Additionally, ACRA has not attempted to show that the use of the lock-out chip — even

if designed to keep other companies from remanufacturing Prebate cartridges — impermissibly exceeds the patent grant to produce anticompetitive effects.

[8] In sum, ACRA has failed to raise a triable issue of fact as to whether Lexmark's restriction on the use of its patented cartridge is valid and, in turn, whether the lock-out chip is a proper mechanism to ensure compliance with the restriction. We affirm the district court's decision on this issue as well.

## IV.

We AFFIRM the district court's grant of summary judgment to Lexmark.